## BANK OF LOUISIANA *v.* FARRAR et ux.

Sect. 32 of the stat. of 7th April, 1824, incorporating the Bank of Louisiana, which authorizes a wife, arrived at the age of majority, to bind herself jointly and *in solido* with her husband, in any hypothecary contracts or obligations entered into by her husband with, or in favor of the bank, according to the true intent and meaning of the charter, was not repealed by the subsequent enactment of art. 2412 of the Code of 1825. That article made no change in the existing law. As to the power of the wife to bind herself with her husband, there is no difference between the 61st law of Toro, and art. 2412.

Sect. 32 of the charter of the Bank of Louisiana, which authorizes a wife to bind herself jointly or *in solido* with her husband, in hypothecary contracts or obligations entered into by any individual with or in favor of that bank, does not limit such authority to contracts authorized by the 13th paragraph of the 15th section of the charter. It empowers the wife to bind herself in any contract which any individual may lawfully make with the bank under its char_ ter. The words "according to the true intent and meaning of this act" in the 32d section, refer to all mortgages which the bank may, under its charter, lawfully take, and not merely to loans made under the provision in the 13th paragraph of the 15th section.

APPEAL from the District Court of the First District, *Buchanan*, J.

Plaintiffs allege that *Preston W. Farrar* and his wife, on the 19th April, 1838, in the State of Mississippi, acknowledged themselves to be jointly and severally indebted to them in the sum of $29,000, being for a loan of money made to them on that day by plaintiffs; which they promised to pay on the 19th April, 1839, executing their joint and several bond for the amount, and mortgaging a plantation and slaves in the parish of Rapides, to secure the payment thereof. Plaintiffs allege that defendants have repaid but a small part of said loan, leaving a balance due of $27,472 53, with interest at nine per cent a year from the 19th April, 1840. The bond and mortgage were annexed to the petition, and both recite that the debt was contracted for "a loan of money this day made to us by said corporation," &c. The answer of *Eliza J. Farrar*, admitted that the bond and mortgage were signed by her; averred that, as to her separate property and her matrimonial claims upon the property of her husband, the bond and mortgage were null and void; that one undivided half of the plantation and

7

slaves so mortgaged, was her separate paraphernal property, inherited from her father; that, at the time of signing the bond, she was in no manner indebted to the petitioners; that she has never, at any time, directly or indirectly, by payment to herself or to any agent, received any loan from them, nor any benefit from any such loan; that the bond and mortgage were not given to secure any loan or discount made by the petitioners to herself or to her husband, as is untruly stated therein, but to secure a debt due by her husband to *Hermann, Briggs & Co.*, a commercial firm in New Orleans, who, being indebted to the petitioners, transferred to them the debt due by her husband; that the said bond and mortgage were executed in violation of the petitioners' charter, and of the settled policy of the State, which will not permit a wife to become the surety of her husband; that when she executed the mortgage, she was entirely ignorant and uninformed of its nature and effect upon her own rights; that it was not read to her before she signed it; and that she was not informed by the judge, at any time or in any manner, of the nature of her legal rights, and of the obligations and renunciations contained therein; and that she did not declare to the judge that she wished to avail herself of the act of 27th March, 1835, as is erroneously stated therein. She prays for judgment in her favor, and to be dismissed with costs.

P. W. *Farrar* made no defence, and a judgment by default was confirmed against him.

*Ilsley*, a witness for the defence, stated that he was the general agent and corresponding clerk of *Hermann, Briggs & Co.*, and had the whole charge of their office; that the defendant, P. W. *Farrar*, had an account with them, which was settled on the 26th May, 1838, when they gave him credit for $24,443 25, the proceeds of notes discounted for his benefit in the Bank of Louisiana; that P. W. *Farrar* obtained a loan from the Bank of Louisiana, the amount of which was transferred to *Hermann, Briggs & Co.*, who, with the proceeds, paid a debt which they owed to the bank; that P. W. *Farrar* did not draw any portion of the proceeds of the loan from the bank; that *Hermann, Briggs & Co.*, had failed; that the loan was obtained by a mortgage of real estate, executed by *Farrar* and his wife; that the bank delivered to *Hermann, Briggs & Co.*, their notes for the amount of the loan to *Farrar*, with the exception of $818 83, which was passed to the general account of *Hermann, Briggs & Co.*; that when the settlement was made, and *Hermann, Briggs & Co.* gave P. W. *Farrar* credit for $24,443 25, there was a balance in his favor of $3,520 10, which was settled by their giving P. W. *Farrar* notes from their port-folio for the amount. A series of letters from *Hermann, Briggs & Co.* to P. W. *Farrar*, written shortly before the loan was negotiated, were offered in evidence, urging *Farrar* to obtain the loan from the bank, for the purpose of paying off the debt which he owed to them. This testimony of *Ilsley* was excepted to by plaintiffs as inadmissible to contradict the declarations of the defendants made by notarial act, but was admitted by the court.

There was a judgment below against the defendants *in solido*, for $27,472 53, with interest at nine per cent a year from the 19th of April, 1840, till paid, with a mortgage on the property described in the petition. The defendants appealed.

L. *Peirce*, for the plaintiffs. The testimony of *Ilsley* was inadmissible. The defendant *E. J. Farrar* was authorized to bind herself. There is no evidence of any of her separate property having been mortgaged, nor of any peculiar arrangement with the Bank of Louisiana as to the loan made in this case.

*R. Hunt,* for the appellants. 1. By art. 2412 of the Civil Code, a wife cannot bind herself for her husband, nor conjointly with him, for debts contracted by him before or during the marriage.

When the law incapacitates persons from making contracts of a particular kind, its provisions cannot be evaded by giving to those contracts a different form from that forbidden by law, where, in substance, the contract is that prohibited. It will not permit that to be done indirectly, which it forbids to be done directly. 8 Mart. N. S. 693. 7 Ib. N. S. 251, 64, 341. 5 Ib. N. S. 431. 4 Robinson, 509.

.2. It is said, that the 32d section of the charter of the bank furnishes an exception to the rule, that a wife cannot bind herself for her husband's debts. Granted ; but, being in derogation of the general policy of the State, this section must be construed strictly. This section declares that, *" In all hypothecary contracts or obligations* entered into by any individual with or in favor of the said president, directors and company of the Bank of Louisiana, *according to the true intent and meaning of this act,* it shall be lawful for the wife of such individual to bind herself jointly and *in solido* with him ; and in such case *the property and rights of the said wife,* either dotal or of any other description, *shall be affected by said contracts or obligations ; provided,"* etc.

Upon this it is to be observed : 1st. That the property of the wife can only be affected by the hypothecary contract or obligation ; and 2d. That the hypothecary contract must be entered into, *" according to the true intent and meaning of this act."*

Now, in order to determine this intent and meaning, and to give due effect to these words of the act, we must examine the other provisions of the charter. The 15th section of the charter lays down certain rules, which it declares " shall form and be *fundamental articles* of the said corporation." The 13th rule under this section, is in the following words : *" Two millions* of the capital stock of this bank, shall be appropriated to the sole purpose of being *loaned upon notes or bond secured by mortgages on immovable property,"* etc. The hypothecary contracts entered into with the bank, according to the true intent and meaning of its charter, as described in the 32d section, are, therefore, such contracts as are described in this rule ; in other words, to use the language of the 13th rule itself, they are *notes or bonds secured by mortgages on immovable property upon which money is loaned by the bank.*

The *loan* of money is essential to the validity of the contract. It must be a direct and *bona fide* loan—such a loan as the 13th rule of the 15th section specifies, and none other. The legislature has so limited and restrained the exception in favor of the bank.

3. Was there such a *loan* made by the bank to *P. W. Farrar* and his wife, as the charter of the bank contemplates? There was not. The evidence shows that the bank had loaned a large amount to *Hermann, Briggs & Co.*, and was anxious to secure the payment of it. *Preston W. Farrar* was indebted to *Hermann, Briggs & Co.* on his separate, personal and individual account. The object and motive of the bank were to obtain a substitution of solvent persons for *Hermann, Briggs & Co.*, who were under protest. *Hermann, Briggs & Co.* transferred the debt of *Farrar* to the bank ; and the bank agreed to accept the same, upon the condition that *Mrs. Farrar's* property should be mortgaged to secure the payment of her husband's separate and individual debt. The transaction was made to assume the form of a loan, or discount on a bond secured by mortgage of *Mrs. Farrar's* property. The discount, so far as the defendants were concerned,

was merely nominal. Not one dollar was paid to *Farrar* or his wife. A *pro forma* check was drawn to the order of *Farrar* and wife, and was endorsed by them; and tho bank transferred the amount of the bond to the credit of *Herman, Briggs & Co.* on the books of tho bank. The amount of *Farrar's* indebtedness to *Hermann, Briggs & Co.* was less than the amount of the bond discounted; they, therefore, opened their portfolio, and gave him notes for the difference between the bond discounted and his note to them.

By these means, it was hoped that the mortgage of *Mrs. Farrar's* property, would secure the ultimate payment of tho debt due by her husband to *Hermann, Briggs & Co.*, which they had transferred to the bank; and that the bank, by this species of novation or substitution, would receive the amount due by *Hermann, Briggs & Co.*, and render *Mrs. Farrar* liable in fact for her husband's indebtedness.

Will the court enforce this contract, and render her thus liable? Is the transaction a *bonâ fide* loan on a hypothecary contract, according to the true intent and meaning of the charter of the bank? She calls upon the court to protect her, and not to suffer her to become the victim of this management on the part of the bank and its creditors; to preserve her rights, in conformity with the settled policy of the State; and not, by extending an exception beyond its express and reasonable limits, to overturn the general law of the land.

*H. A. Bullard*, on the same side. 1st. In the construction of statutes effect is to be given to every word, if possible. The expression, "according to the true intent and meaning of this act," cannot be rejected as surplusage. Only *bonâ fide* loans to husband and wife, to be reimbursed in five annual instalments, are embraced. In such cases, and to such extent only, is the incapacity of the wife removed, or modified.

2d. Laws made in derogation of prohibitory statutes are to be strictly construed as relates to disabilities, and will not be extended beyond the cases expressly embraced within them. See 11 Peters, 420. Suppose a minor engaged in commerce authorized to mortgage his estates for a loan of money, could he validly contract a mortgage as security, and to pay a pre-existing debt of his partner, *due* to the *lender himself?*

3d. The charter authorises the wife to bind herself jointly, or jointly and severally, with her husband, for a *loan*, presumed to be for the joint benefit, to furnish means to be employed advantageously for the community.

4th. The section of the charter which defines the powers and capacities of the bank, gives it generally a capacity to take security by mortgage. This is not a corporate franchise, but merely a capacity in common with natural persons of full age, necessarily implying that such mortgages may be stipulated with persons capable, according to law for the time being, to mortgage their property.

5th. The contract is not a loan within the true intent and meaning of the charter. The lender was the creditor of *P. W. Farrar*, and no money was paid. It was turned over to pay the pre-existing debt—a mere novation. The form only of a loan was given it, to disguise the payment and the husband's debt, and to evade the prohibitory clause of the Code, art. 2412. The question is, to what extent has the charter modified the incapacity of married women?

6th. The law existing in 1824, and in force when the charter of the Bank of Louisiana was passed, to wit, the old Code, provided that a corporation might be repealed entirely by the legislature, if necessary or convenient for the public interest, provided that when such corporation imports a contract upon the faith

of which individuals have advanced money or engaged their property, provision is made to reimburse such advances, or for *making full indemnity to such individuals.* Civil Code, art. 438. The bank was established on that condition. A privilege to raise money by lottery, unlimited as to time in the grant, may be limited by the legislature, without violating a *contract*, or infringing upon any vested right. It did not form a part of the contract between the State and the bank, that married women should always be capable of contracting, whatever mischiefs might result from such a capacity. 3 Story on the Const. 1386. See the Lottery case in 2 Robinson, 273. 3 Howard, 550.

7th. The new Civil Code has repealed the clause in the charter of the Bank of Louisiana. The Code was promulgated in 1825 ; the charter in 1824.

8th. Courts will look to the real character—the essence of contracts, and not stick at the external forms. Where a series of transactions between A. and B. began with a loan of money on mortgage, and ended with a *vente à réméré*, the sale will still be regarded as nothing but a mortgage in disguise. *Contrat pignoratif.* Merlin, Questions de Droit, *verbo* Contrat Pignoratif, 278. Faculté de Rachat, 108. *Patterson* v. *Bonner*, 14 La. 215.

9th. The bank has no vested interest in the capacity of any class of persons to enter into particular contracts with it. The capacity of particular classes of persons depends absolutely on the will of the legislature. The Code is not unconstitutional. The charter *modified* the *previous law*. The Code declared a complete disability, and repealed the charter *quoad* the capacity of married women to contract. See *Hyde* v. *Planter's Bank*, 8 Robinson.

10th. Renunciation before a notary public now essential to bind married women. B. and C.'s Digest 553.

The judgment of the court was pronounced by

EUSTIS, C. J. On the 19th of April, 1838, at Woodville, Wilkinson county, State of Mississippi, *Preston W. Farrar* and his wife acknowledged themselves to be jointly and severally indebted to the plaintiffs in the sum of $29,000, for a loan of money stated to have been on that day made to them by the plaintiffs, which they acknowledged to have received, and which they bound themselves to pay on the 19th of April, 1839, *fixed.* To secure the payment of this debt, on the same day and at the same place, the parties mortgaged to the plaintiffs a certain plantation and slaves in the parish of Rapides.

The plaintiffs contend that, under the 32d section of the charter of the Bank of Louisiana, *Mrs. Farrar* bound herself jointly and severally with her husband, and that her rights and interest in the property mortgaged are affected by this obligation. The section reads as follows : " In all hypothecary contracts or obligations entered into by any individual with, or in favor of the president, directors and company of the Bank of Louisiana, according to the true intent and meaning of this act, it shall be lawful for the wife of such individual to bind herself jointly and *in solido* with him, and, in such case, the property and rights of said wife, either dotal or of any other description, shall be affected by said contracts or obligations, provided said wife be of age of majority at the time of entering into such contracts or obligations."

The charter of the bank was passed on the 7th of April, 1824, and it is contended on the part of *Mrs. Farrar*, who is the sole appellant, that this section is repealed by article 2412 of the Civil Code, which provides that, "The wife, whether separated in property by contract or by judgment, or not separated, cannot bind herself for her husband, nor conjointly with him, for debts contracted by him before or during the marriage."

The Code was promulgated and went into effect in May, 1825. The article 2412 was not contained in the old Code of 1808, but was one of the amendments proposed by the commissioners in their *projêt* to the legislature. Vide *projêt*, page 70.

The question of the repeal of this section by the Code is not one of the construction of conflicting statutes, but rather of the interpretation of a system of laws. The body of law, promulgated under the title of the Civil Code of the State of Louisiana, is not to be considered technically as a statute, but as a Code, and effect must bo given to its provisions as such. It becomes necessary to state what the law was, on this subject of the incapacity of married women to bind themselves for the debts of their husbands, previously to the Code of 1825.

The 61st law of Toro was then in force, and it provided as follows: "From henceforth it shall not be lawful for the wife to bind herself as surety for her husband, although it should be alleged that the debt was converted to her benefit; and we do also order that when the husband and wife shall bind themselves jointly in one contract, or severally, the wife shall not be bound in any thing, unless it shall be proved that the debt was converted to her benefit, and she shall then be bound in proportion to what shall have been so applied. But if the debt so applied to her use served only to procure that which her husband was obliged to supply her with, such as food, clothing and other necessaries, then we say she shall not be bound in any thing." Novissima Recopilacion, 10, 11, 3.

It was contended that this law of Toro was repealed by the Code of 1808; but the Supreme Court held otherwise, and the provisions of the Code and of the Spanish law remained equally in force. *Durnford* v. *Gross*, 7 Martin, 489.

By the Code of 1825 the Spanish laws on that subject were repealed, and this article, and others of the Code *in pari materia*, became the law on the subject of the disabilities of married women to contract.

The article 2412, under consideration, we consider as making no change in the law as it then stood, but as an embodiment of its different provisions and of the jurisprudence at the time it was enacted.

The exception in section 32 of the charter existed before the Code, and as no change was made in the law we see no reason why it should be held to be repealed by the enactment of article 2412. It was an exception to the former law; it remains an exception to this. There may be some difference between article 2412 and the law of Toro concerning the proof; but as to the power, or faculty of the wife to bind herself, there is no difference.

We do not understand that, by a revision of the laws, and the enactment of a law in which no change purports to be made of the legislation on that subject, where there is no clause of repeal, nor any intimation of the legislative will to that effect, that a special privilege in favor of a public institution can be held to be repealed. We do not understand such to be the legal intendment of the article under consideration. All laws must be taken and considered as forming a part of one system, and be construed with reference to each other.

In Louisiana special laws form a large portion of our legislation. It is one of the evils of the times. An effort was made in the late convention to place some restraint on what was felt to be an abuse in legislation. It failed, and special legislation is a part of our system. We cannot hold this section to be repealed by what we consider an implication; for the exception of the 32d article is no more in contradiction with article 2412, than it was to the laws in reference

to which it was passed; the relation it bears to each is to all intents and purposes identical.

But if we had any difficulty in ascertaining the intendment of this article, it vanishes when we take into consideration the facts attendant on its enactment, and the subsequent legislation on this subject. The charter of the bank was passed, in April, 1824. At that time the *projét*, in which this article figures, was before the legislature, and had received a most elaborate discussion. The removal of the disability and its establishment were made at the same session. This charter was a matter of most serious interest to the agricultural interests of the State. It was for the relief of that interest, and on its credit that the bank was established. The State owned one-half its stock, and, by its bonds, provided one-half of its capital. The agricultural interest could not be reached without a removal of this disability on the part of married women, who owned a large portion of the best estates, and who had rights on the lands and slaves of the planters to a still greater extent. To suppose that the legislature, at the time of making this provision for the security of the loans in which one-half the capital of the bank was to be invested, would render it inoperative by means of a general law, is inconsistent with all ideas not only of probability but of legislative propriety. The hypothesis brings us to a conclusion from which a court of justice must recoil.

But the subsequent legislation is still more conclusive on this point. All the banks chartered by the legislature since 1824 have the same provision in their favor, as to the power of married women to bind themselves, as that contained in the charter of the Bank of Louisiana.

The establishment of banks necessarily threw upon them the business of lending money, and we can say, without danger of exaggeration, that nine-tenths of the whole debt due by the landed interest in this State, was due to the banks ; so that, as far as the general policy of the State can be inferred from legislation and its necessary result, it was in favor of removing the disabilities of married women to bind themselves for the debts of their husbands, rather than of restraining them from making such contracts. The cases under the exception far exceed those under the operation of the rule. We believe such to be universally the case wherever the prohibition existed.

In Rome, a woman could not become a surety for another. The *Senatusconsultum Velleianum* destroyed the obligation. Justinian afterwards permitted women to renounce the exception which the *Senatusconsultum* gave them. This law was in force in the parts of France under the jurisdiction of the parliament of Paris, and the prohibition of the *Senatusconsultum* became useless, in consequence of its renunciation being made a matter of course by notaries. Pothier on Obligations, No. 388.

By the laws of Spain the wife could bind herself for her husband's debts, provided she renounced the law of Toro. *Beauregard* v. *Piernas*, 1 Martin, 294. *Banks* v. *Trudeau*, 2 Martin N. S. 39. *Perry* v. *Grebeau*, 5 Ib. 19. 7 Martin, 489.

In France, under the Napoleon Code, the wife labors under no disability to bind herself for the debts of her husband, since the repeal of the *Senatusconsultum Velleianum.*

The authorities on this subject are collected and well stated, in the learned argument by the counsel for the plaintiff in the case already cited of *Darnford* v. *Gross.*

In England, and in most of our sister States, where, by marriage, the legal existence of the wife is incorporated in the person of the husband, the right of the wife to bind her separate estate by contract, can no longer be questioned. 1 Blackstone, 442. Story's Equity, § 1400, 1401, and notes.

Being, therefore, of opinion that the section under consideration is not repealed, it is unnecessary to examine the questions concerning the power of the legislature over personal rights and disabilities, or the nature and character of the privilege given to the bank by this section.

It is next urged, on behalf of the defendant and appellant, that, at the time she signed the bond and mortgage sued on, she was not indebted to the bank, that she never received any sum of money loaned by the bank, nor was ever, directly or indirectly, benefitted by the money alleged to have been loaned to her husband ; that, in point of fact, the bond and mortgage were not given to secure any loan or discount made by said bank to the defendant, or to her husband, but to secure a debt due by the husband to third persons, and that, for that reason, the bond and mortgage did not create such an hypothecary contract as a married woman is authorized to make under the charter.

The facts of the case, we infer from the evidence and written argument of the counsel, to be, that previous to the execution of the bond and mortgage, the bank held notes of *Hermann, Briggs & Co.*, to an amount exceeding that mentioned in the bond ; that that house had stopped payment, and the husband of the defendant was its debtor ; that on this bond and mortgage a loan was effected from the bank, the whole proceeds of which were not actually paid in hand to the husband and wife, but of which a large portion was transferred to the credit of *Hermann, Briggs & Co.*, on the joint check of the parties to the bond, the bank delivering up to *Hermann, Briggs & Co.* their notes for nearly the amount, excepting a sum of $818 83, which was passed to the general account of *Hermann, Briggs & Co.*

The portion of the loan passed to the credit of *Hermann, Briggs & Co.*, was $24,443 25, and the entry is made in their books on the 26th May, 1838. This sum exceeded the debt due by *Mr. Farrar* to *Hermann, Briggs & Co.*, who refunded him the difference, $3,520 18. Of the disposition of the difference between the proceeds of the loan, $29,000, less the discount, and the amount transferred by the check of *Mr. Farrar* to *Hermann, Briggs & Co.*, we have no evidence before us.

It is very far from being clear to us that this transaction, so far as the bank is concerned, is not a loan. No privity on the part of the bank is proved to have existed as to the future disposition of the proceeds of the bond, still less any condition imposed to appropriate them to the payments of the debts due the bank by *Hermann, Briggs & Co.* We should hesitate before we could infer such an agreement from the fact that a portion, even a large one, had been so appropriated, on the joint check of the parties. The amount thus passed to the credit of *Hermann, Briggs & Co.*, was not the whole proceeds of the loan, and exceeded the debt due them by *Mr. Farrar* by some $3,500.

The argument is that, if the proceeds of this obligation were thus applied to the payment of the debt of a third person, there was, in fact, no loan, and that we must not look to the form, but to the substance of the contract; that by the 32d section of the charter, the hypothecary contracts to which the wife can become a party, are by the terms " according to the true intent and meaning of this act," limited to the case provided for in the thirteenth

BANK OF
LOUISIANA
v.
FARRAR.

paragraph of the fifteenth section, which contains certain provisions—fourteen in number—which are declared to be *fundamental articles of the constitution of the corporation.* This paragraph provides that "two millions of the capital stock of said bank shall be appropriated to the sole purpose of being loaned upon notes or bonds, secured by mortgages on immoveable property, to the satisfaction of the board," &c.

There having been no loan made within the intendment of this paragraph, it is contended that the obligation of the wife is not within the authorization provided for by the 32d section. But the section does not even mention *loans.* It provides *for all hypothecary contracts or obligations,* entered into by any individual with, or in favor of the bank, according to the true intent and meaning of the charter. Any contract that any individual may lawfully make with the bank, according to the terms of the charter, is certainly comprehended within this section. Can the bank make or receive any other hypothecary contracts, except for loans, under the thirteenth paragraph? The charter certainly provides for other cases. In section 9th, with the general powers, is given the power to take *mortgages and pledges;* to discount, upon banking principles, on such credit and *on such security,* as they (the directors) may think adviseable.

In section 28 it is provided, that "all hypothecary bonds loaned upon, and all mortgages given to secure the payments of notes discounted by any of said offices of discount and deposit, shall be made," &c.

In other sections the general terms, all mortgages, are used, and this 32d section has the equally, if not more comprehensive terms of all *hypothecary contracts or obligations entered into by any individual.* The terms "*according to the true intent and meaning of this act,*" we understand to refer to all mortgages which the bank, under its charter, may lawfully receive in the proper and just exercise of its powers, and not merely to loans made under the provision for the appropriation of the fund to be loaned to the landed interest. We do not understand that there is any ground for such a limitation. There is none expressed, nor can any such inference be drawn from the words used.

If the contract made by *Mr. Farrar* is binding upon him, under the charter of the bank, it was one to which the defendant and appellant could become a party, and bind her property for the performance of it under the 32d section.

The bond and mortgage, having been passed out of the State, was duly recorded in the parish where the property was situated, and our attention has not been directed to any matter of form which affects their validity.

*Judgment affirmed.*