THE BANK OF LOUISIANA *v.* D. P. WILLIAMS et ux.

1. CONTRACTS — LEX LOCI CONTRACTUS.— The general rule is, that the *lex loci contractus* governs as to validity and construction; unless, indeed, some other state or country is appointed by the parties as the place of performance, and the contract is made with special reference to its laws.

2. SAME — RIGHTS OF SOVEREIGNTY — LEX FORI.— It is the prerogative of the sovereignty of every country to define the condition of its members, not merely its resident inhabitants, but others, temporarily there, as to capacity and incapacity. But capacity or incapacity, as to acts done in a foreign country, where the person may be temporarily, will be recognized as valid or not, in the forum of his domicile, as they may infringe or not, its interests, laws and policy.

3. MARRIED WOMEN — HOW THEY HOLD PROPERTY IN THIS STATE.— Married women in this state hold their property by a tenure, which is defined either by the statute, or the instrument under which it is conveyed to them.

4. SAME — SAME — HER POWER OVER IT BY STATUTE.— The doctrine in this state is that a married woman, unless the instrument creating her estate otherwise provides, holds separate property, whether owned at her marriage, or acquired since, as if the 23d, 24th, 25th, 26th and 27th articles of the Code, 1857, pages 335 and 336, were embodied in an instrument conferring the property upon her.

5. SAME — SAME — SAME.— Instead of looking at the rules and principles which were devised in equity, as defining a married woman's relation to and power over her property, we refer to the statutes as prescribing the conditions on which she may charge it, or to the instrument under which she holds it. They are limitations of her estate; they are the conditions on which it rests.

6. SAME — SAME — CREDITOR OF MARRIED WOMAN SEEKING REMEDY IN THE COURTS OF THIS STATE MUST SUBMIT HIMSELF TO THE LEX FORI.— If a foreign creditor comes into this state and seeks compulsory payment of a debt made by a wife abroad, he must submit himself to the law of the forum for his remedy. He must consult the rules and regulations, which govern courts here, as to the form of the suit, according to the character of his "right." Our system of jurisprudence determines whether he must sue at law or in chancery.

7. SAME — SAME — NO REMEDY AGAINST MARRIED WOMEN PERSONALLY, BUT AGAINST HER ESTATE. — If a married woman contracts a debt in Louisiana, or at home, she charges it upon her estate here, unless the terms upon which the estate rests and is held forbid it. It matters not whether the suit be at law or

in equity, whether the property be unconditionally hers at the marriage, or come to her by descent or devise afterward, or in any other mode. Creditors (upon whatever condition the debt arose) have no remedy under our system of jurisprudence against her "personally." The proceeding is *in rem* against her estate. If the suit be at law under the statute, while the judgment may be for so much money, it is a necessary part of it that it be levied of her separate estate.

8. Same — same — condition precedent to recovery at law or equity against her is a separate estate. — The condition precedent to a right of recovery against a married woman, either at law or in equity, is, that there be a separate estate out of which satisfaction may be had. Our system has remedial machinery only against those married women who have separate property, and only then to the extent of its value or its income, as the case may be.

9. Same — same — difference between separate estates as recognized by equity courts and the statute. — The difference between the separate estate, as recognized in courts of equity, and the title to property and rights connected with it, as declared and defined in the statutes, is that the former is an equitable and the latter is a legal estate. The former is created by a conventional instrument or by devise, and may contain restriction on the power of disposition.

10. The charter of the Bank of Louisiana in reference to the capacity of married women. — The charter of the Bank of Louisiana is a special law, founded on a local policy, and to be construed strictly. The class of married women contemplated by it as capable of contracting were the wives of agriculturalists having land in Louisiana, and hence, a contract made in Louisiana by a married woman, temporarily there, but resident in this state, cannot be enforced against her personally in the courts of this state.

Error to the circuit court of Adams county. Smiley, J.

The opinion of the court states the facts of the case, presenting the question discussed and decided.

*Wm. F. Mellen*, for plaintiff in error.

1. If contracts relate to movables, they are governed by the *lex loci contractus, ubi celebratus est* or the *lex loci contractus ubi destinati solutio est.* If to immovables, they are governed by the *lex loci rei sitæ.* 2 Pars. on Cont. 570; La. Code Prac. art. 13; Civ. Code La. art. 10; 2 Kent's Com. 450, 457; 17 La. 589; 1 ib. 533; 4 N. S. 1; 5 ib. 567; 11 Mart. 23; 40 Miss. 29; 34 ib. 56; ib. 181 and authorities cited; Story on Confl. Laws, 280; 4 How. (U. S.) 238. A contract as to its nature, construction and validity is governed by the law of the place where it is entered into. But it is competent for parties to contract

that it shall be governed by the law of the place where it is to be performed. 34 Miss. 181; 2 Kent's Com. 459; 13 Pet. 65; 9 Smedes and Marsh. 220; 11 ib. 140; 8 N. S. 1,; 30 Miss. 59; 69 ib. 548; 2 Burr. 1077. It is a rule that the *lex domicilii* governs as to the capacity and incapacity of persons, but the exceptions have outgrown the rule. Where the *lex loci contractus* and the law of the domicile conflicts, the former prevails. One does not carry the law of his domicile about over the world with him; and to a contract valid and binding in the foreign country where made, he cannot plead a disability imposed by the *lex domicilii*, the law of his home country. 2 Pars. 573, 574; Samuel v. his Creditors, 5 N. S. 597, 598; 2 Pars. on Cont. (edition 1866), 567–602. The constitution of the United States requires "that full force and credit shall be given in each state to the public acts, records and judicial proceedings of every other state."

2. Was Mrs. Williams personally bound by and under this contract under the laws of Louisiana? This court is required by the Rev. Code of Mississippi to take judicial cognizance of the laws of other states when properly presented before it. The thirty-second section, charter of the Bank of Louisiana, fixed the liability of Mrs. Williams, and bound her under the contract on which we sue. "An act to incorporate the subscribers of the Bank of Louisiana," approved April 7, 1824; Civ. Code, art. 2086; Bank of La. v. Farrar, 1 Ann. 49; 35 Miss. 25; 41 ib. 188; Justin. Novel. 134, ch. 8; Civ. Code La. 1779; Code Nap.

3. Will the courts of Mississippi enforce the contract against Mrs. Williams? The rule of domicile is a rule of comity to be enforced or not according to the will of the sovereign. 35 Miss. 667; Rowan v. Garland, 2 Smedes & Marsh. To render a law or contract in another state void when sought to be enforced here, as against our public policy, some detriment to the rights, liberties, interests or morals of the people or the laws or institutions of the state must be shown. 37 Miss. 251; 2 Kent's Com. 602; Story on

Confl. of Laws, § 98. The exercise of comity in admitting or restraining the application of the *lex loci* must rest in sound judicial discretion, dictated by the circumstances of the case. 13 Miss. 6; 18 Pick. 193, 225; 2 Kent, 602, and notes; Story on Confl. of Laws, 23, 24. The laws of every state have force only within the limits of its own government, and bind those who are subjects thereof, and they possess no extra-territorial effect or jurisdiction. But comity being a principle of the law of nations may be said to constitute a part of the civil jurisprudence of every state, which claims to belong to the community of civilized nations. Lyon et al. v. Knott et ux., 26 Miss. 566; 9 Smedes & Marsh. 56; 32 Miss. 274. We do not think it is against the public policy of the state to bind a married woman, when, evidently intending to bind herself and her separate property, she enters into a valid contract avowedly for that purpose. 33 Miss. 543. The laws of 1839, 1846 and 1857, were enabling statutes, enlarging the wife's power to acquire and hold property, and her capacity to bind herself and her property by contract. 12 Smedes & Marsh. 419; 23 Miss. 236; ib. 264; 7 Smedes & Marsh. 83; 9 ib. 445; 23 Miss. 283. So far as the general policy of the state of Mississippi can be inferred from her legislation, it is in favor of removing the disabilities of married women to bind themselves by contract, rather than of restraining them from making contracts.

Courts of common law have concurrent jurisdiction with equity tribunals in all cases arising under the statutes known as the married women's laws. 12 Smedes & Marsh. 490; 23 Miss. 236; ib. 264; 41 ib. 112; Rev. Code 1857, art. 27, p. 337; ib. art. 26, p. 336; Act of 1846, § 5. However, it is very true, that the acts called married women's laws are acts of settlement, and chancery courts are the proper tribunals to adjudicate upon the rights thereunder arising.

*W. T. Martin*, for defendants in error.

At common law, as a general rule, a *feme covert* could do no act to bind herself, and her attempts so to do were *ab initio* void. Tyler on Inf. and Cov. 315 ; 1 Pet. 338 ; Robertson v. Bruner, 24 Miss. 242. She could not bind herself, as maker of a promissory note (18 Md. 457 ; 15 Barb. 28 ; Clancy on Rights, 23), and this was so though living separate, having a maintenance. 8 Term R. 545 ; 2 Bos. & Pul. 93 ; 3 East, 331. She might even defeat a contract made by her in fraud. 39 Penn. 279 ; 4 Campb. 26 ; Tyler on Inf. and Cov. 214. She could not, at common law, make a valid contract affecting real or personal property. 6 Wend. 9–13 ; 1 Taunt. 312 ; 2 Bright on Husband and Wife, 38 and authorities cited ; Tyler, 317. Her separate property could not be held for necessaries bought by her, but her husband was liable. 2 Bright on Husband and Wife, 2 ; 33 Barb. 160, 164.

A married woman, holding property under a settlement or deed of trust, can bind it only in the mode pointed out in the instrument creating her right to such property. When, by statute law, a married woman may contract, so as to bind herself, she can do so only in the mode and to the extent prescribed by the enabling act. Tyler on Inf. and Cov. 315, and authorities ; 24 Miss. 242. The act of 1839 did not confer on married women the power to contract or to bind themselves. 7 Smedes & Marsh. 64 ; ib. 78 ; ib. 435 ; 24 Miss. 242, 416. The act of February, 1846, declares what contracts might be made so as to bind the wife ; and, in the Revised Code of 1857, the various acts of our legislature, on the subject of the rights and property of married women, are consolidated. 24 Miss. 242. This is a suit at law. It does not appear, by allegation, that Mrs. Williams possessed any separate property, and so, we know not under which act, or under what conditions, if she has any, she holds it. Nor is it alleged that the contract here sued on is of the character required in either of the acts of the legislature. Under the circumstances, her separate estate, if she

has any, could not be changed by the judgment at law. 24 Miss. 416. The policy of our legislature is to protect the wife against the misfortunes, improvidence or crimes of the husband. The comity of nations does not impose on us the violation of this policy for the sake of *lex loci contractus.* Of what avail would our humane and wise legislation be, if it could be evaded by the artifices of the husband or his creditors; procuring the wife to contract, in Louisiana, or elsewhere, to her injury, and then using the machinery of our courts to get a judgment on the contract. It will not be denied that, in general, as a matter of comity, the courts of every country ought to, and will, give effect to contracts made elsewhere, if valid where they are made. But comity does not require that contracts made in one country, where they were valid, should be enforced in another, where the enforcement would be against the public policy. Story on Confl. of Laws (ed. 1857), p. 371, § 244, and authorities cited.

SIMRALL, J. :

The Bank of Louisiana, a corporation created by the state of Louisiana and domiciled there, sued David P. Williams and Elizabeth M., his wife, to recover the amount due on a promissory note, dated Concordia Parish, La., April 8, 1857, for $30,000, payable one year after date; the note was secured by mortgage on property situated in said Concordia Parish, La., executed by Williams and wife. Mrs. Williams pleaded her coverture, and that she was, at the date of the contract, resident in Adams county, Miss., and has since resided there.

The plaintiff relied upon the fact, that the charter of the bank authorized a married woman, jointly with her husband, to make this sort of contract.

It will thus be perceived that this is one of those embarrassing questions, arising out of the conflict of laws so perplexing to the courts. The general rule is, that *lex loci contractus* governs as to validity and construction; unless,

indeed, some other state or country is appointed by the parties as the place of performance, and the contract is made with special reference to its law. It is laid down by Story on Confl. of Laws, § 232, to be a universal principle, common to the civilized world, essential to a contract, that it shall be upon a sufficient consideration, and lawful in its terms and purposes.

Theoretically, the rule of the civil law of continental Europe is, that the legal capacity of a person to do, or not to do, certain acts, is to be referred to the law of the domicile. Thus, the Code Napoleon enacts: "The laws concerning the status and capacity of persons govern Frenchmen, even when residing in a foreign country." Practically, no nation or state ever gave effect to such a rule; the modifications and exceptions became so numerous that they have taken the place of the rule itself and almost superseded it.

It is not true, generally, that the "status" and "capacity" of persons in foreign countries is determinable by the law of their domicile. An English nobleman would not be permitted, in an American court, to put in an answer in chancery on honor, because he had that privilege in his own country. Nor would a person, who had incurred the penalties of *premunire*, or who had suffered judgment of outlawry, be denied a remedy in our courts for a debt or a personal wrong, because the British courts were closed against him. In both cases, so soon as the limits of the country of the domicile are passed, the privilege in the one instance and the disability in the other, cease to have effect and will not be respected.

It is the prerogative of the sovereignty of every country to define the conditions of its members, not merely its resident inhabitants, but others temporarily there as to capacity and incapacity. But capacity or incapacity, as to acts done in a foreign country, where the person may be temporarily, will be recognized as valid or not in the forum of his domi-

cile, as they may infringe or not its interests, laws and policies.

Relations which are natural, and therefore universal, as husband and wife, parent and child, and tender infancy, will be considered as subsisting everywhere, and are under the protection of the laws of every country where the parties sustaining them may go. Natural incapacity is incident to tender infancy. The child of six, eight or ten years has not attained to the state of free moral agency, and is not accountable for his actions. It is to be supposed, therefore, that the courts of all countries would consider his acts, wherever done, as imposing no responsibility. But the age at which majority is attained, and responsibility for acts done begins, is not uniform in all countries. Each for itself prescribes the time, each determines for itself when the will and judgment are sufficiently matured for the duties and responsibilities of independent conduct. Thompson v. Ketcham, 8 Johns. 192, illustrates the proposition. The note was made in Jamaica, the defense was infancy according to the law of New York. It was determined that the transaction was subject to the law of the place of the contract and that infancy was a defense or not according to the law of Jamaica.

Contracts may be "located" in a country or state other than that in which they are made, as when performance is appointed there, and the parties may be supposed to have had in view that law. Dutton v. Murphy, 30 Miss. 65 ; Le Breton v. Miles, 8 Paige, 265.

Married women in this state hold their property by a tenure, which is defined either by the statute or the instrument under which it is conveyed to them. The original of the laws creating their separate estates is, doubtless, the doctrine which sprung up in the equity courts recognizing their usufructuary interest, while the legal title was held for their use by a trustee. The principle was imported by the equity courts from the civil law, as were many others. As usee or *cestui que trust*, they were regarded as owners, capa-

ble of almost an unrestrained power of disposition. They could not be called to account for the manner in which they disposed of the income, and they could create charges and debts which equity would respect and effectuate out of the trust property. The entire theory had its origin in the equity courts, and was encouraged and amplified, so as to free married women from marital restraints and disabilities *quoad* the trust estate. In their transactions touching the property, they were treated as owners, they acted as *femes sole ;* but it was only in the courts of chancery that they had that character. The law courts, whenever their contracts or obligations were brought before them, rejected them as void pacts importing no force or validity. The circumstance that she had a separate estate, and made the engagement with reference to payment from that source, did not emancipate them from the disability of coverture. Our statutes, therefore, undertook to deal with this subject so as to simplify her relations to her property, her power over it, and, by operation of law, to convert the equitable estate *sub modo* into a legal estate ; so that, in so far as it was wise and prudent for her to create liabilities, they should be legal debts recognizable in a court of law and collectible out of her property. Instead of looking to the rules and principles which were devised in equity as defining her relations and powers over her property, we refer to the statutes as prescribing the conditions upon which she may charge it, or to the instrument under which she holds it. They are limitations of her estate ; they are the conditions on which it rests. If a foreign creditor comes into this state and seeks compulsory payment of a debt made by a wife abroad, he must submit himself to the law of the forum for his remedy ; he must consult the rules and regulations which govern courts here as to the form of the suit, and, according to the character of his "right," our system of jurisprudence determines whether he must sue at law or in chancery.

If an estate be in the wife by deed or will, with power expressly conferred to borrow money, or incur debt, for all

purposes which shall be binding upon it, he may address himself to the chancellor, as a creditor, having a right to be paid out of that fund. If he goes into a court of law, he is met at the threshold with a notice that the wife holds her separate property, under certain restrictions and limitations ; that, if the boundaries of her power have not been passed, the court is. prepared to give him redress. But he must satisfy the court that his debt was such a charge upon her estate, or its income, as she had the power to make ;· otherwise it would be a violation of the tenure, the conditions of her title, to allow him to subject it. But the creditor may say, " I. cannot bring this debt within the terms defined by your law. Nevertheless it was such a contract as a married woman could make by the law of Louisiana. ` Comity requires your courts to treat the contract precisely as Louisiana would, and I demand a judgment against the wife." " No," says the court, " you cannot get here any fruit of a judgment ; there is nothing subject to its payment, and our law affords no remedy against a married woman in any of its courts, law or equity, except through a property which she has, and which must be pointed out by the creditor. We know of no such thing as a personal obligation, aside from and independent of a property which may discharge it." If she holds property under a deed or will, with unlimited power to charge and dispose of it, a court of equity will effectuate her contracts, by treating them as a charge or *quasi* lien on her estate, but not as creating any personal obligation on her, for the moment her separate estate has been exhausted (there being no personal separate obligation), all remedy in favor of creditors is exhausted.

But it is said that this contract, being made in Louisiana, if good there is good everywhere. Let us look closely to the transaction and analyze its parts and its entirety. The charter of the bank directed two millions of its capital to be employed in loans to the agricultural interest, on notes and mortgages, renewable for a term of years ; the property hy-

pothecated to be worth twice the amount of the loan ; and, inasmuch as many landed estates belonged to married women, by the thirty-second section of the charter they were authorized to "bind themselves jointly and *in solido* with their husbands, in all hypothecatory contracts and obligations made with the bank, and in such case the property and rights of such wife, either dotal or of any other description, shall be affected by such contracts and obligations, provided the wife be of age at the making of the contract." It is manifest that the scheme of the bank was to encourage the agricultural interests of Louisiana, and the loans of the $2,000,000 were to be made upon real estate situated there. The loans to agriculturists are expressly required to be made upon mortgage —"hypothecary contracts" is the language. The wife is emancipated, so far, and so far only, as to capacitate her to join with her husband in the "hypothecary obligation." She subjects all her rights and property, "dotal," or of any other description. Her paraphernalia, wardrobe, jewels and ornaments, according to her degree in life, are pledged, as well as her property at the marriage, or subsequently coming to her. This obligation, which is exceptional, not allowed by the general law in its scope and effect, submits all her property and rights to the discharge of this obligation. This brief review conclusively shows that the contract is local, purely and entirely, founded upon a local policy, and can only be made by a class of married women, the wives of agriculturists, whose estates are situate in Louisiana. It certainly was not contemplated by the charter of the bank that these loans should be made on mortgages of plantations outside of that state. It was intended that the most ample security should be given for the debts, and that the performance of the contract should be made within the state. Nor was it supposed that the obligation of the wife extended further than to cover her dotal and paraphernal rights and property in that state. It is as much as if the law-maker had said, married women can mortgage their landed estates,

and bind dotal and other property situate in that state, for this sort of contracts.

The transaction stands upon ground local to Louisiana, and a policy there which is exceptional from the general rule and general law. Assuming, as a doctrine of the law, that the contract of a married woman, valid at the place where made, shall be so regarded everywhere, does that embrace an obligation incurred by her, growing out of special circumstances, and not included in the general law and policy of the place, but resting altogether on special reasons, and looking to local property for its payment? If, by the law of Louisiana, a married woman was competent to incur debts generally, and coverture imposed no disability, it would be a different question from that we are dealing with. If a married woman resident here, while temporarily in that state, should incur a debt and courts should be appealed to to enforce it, comity might enjoin the duty of a remedy, if our system could provide one. But we would be under no duty to give a "personal judgment" if such a proceeding had no place in our jurisprudence. The utmost that we could do would be to lay hold of her property here and apply it, provided in so doing we did no violence to the essential conditions and tenure by which she held it. If she contracts a debt in Louisiana, or at home, she charges it upon her estate here, unless the terms upon which the estate rests and is held forbid it. It matters not whether the suit be at law or in equity, whether the property be unconditionally hers at the marriage, or come to her by descent or devise afterward, or in any other mode, creditors, upon whatever consideration the debt arose, have no remedy under our system of jurisprudence, against her "personally." The proceeding is *in rem* against her estate. If the suit be at law under the statute, while the judgment may be for so much money, it is a necessary part of it, that it be levied of her separate estate. The condition precedent to a right of recovery either at law or in equity is, that there be a separate estate out of which satisfaction may be

had.. Our jurisprudence does not realize the possibility of a "personal judgment against a married woman." And has remedial machinery for creditors, only against those who have property, and only then to the extent of its value or its income, as the case may be.

But for the express authority conferred by our statutes, it is evident that a married woman could not be sued at law upon her contracts. To the extent enumerated in articles 24 and 25, courts of law are empowered to enforce her contracts (but that as we have said is specifically against the property). The difference between the separate estate, as recognized in courts of equity, and the title to property, and rights connected with it, as declared and defined in the statutes is, that the former is an equitable, and the latter is a legal estate; the former is created by a conventional instrument, or by devise, and may contain restrictions or not on the power of disposition, or the title may be simply placed in a trustee for her use, without prescribing the extent of her power over the estate, or restricting her right of charging it. In the leading case in this country, of Jacques v. Methodist Church, Johns. Ch., it was accepted by Chancellor Kent, as the true doctrine, that she was, as to her separate estate, a "*feme sole,*" and may charge or dispose of it very much at her pleasure, unless restrained by the instrument creating it. In the later case of Gardner v. Gardner, 22 Wend. 526, it was held to be the better opinion, that debts contracted expressly for her own account ought to be considered as an appropriation, or appointment for the creditor of so much of her separate estate as may be needed to pay the debt. The earlier English cases proceeded upon the ground, that the main object of the trust was, that the property might be deemed as held for the payment of her debts. Norton v. Turville, 2 P. Wms. 145. In Peacock v. Monk, 2 Ves. Sr., Lord Hardwicke said : "If the wife gave a bond for borrowed money, this would give a foundation to demand the money out of her estate. The doctrine was extended so as to include all obligations given by the wife,

whether as surety for the husband, or a stranger, on the predicate that, by creating the obligation, she must have meant to appoint its payment out of her separate estate, as that was the only mode in which she could give it effect. 2 Story's Eq. Jur., §§ 1399 to 1402. There seems to be a tendency in some of the later cases to repudiate the reasoning founded upon the idea of an appointment; its fallacy was exposed in a late case by Lord Cottingham. If a married woman makes several notes, of different dates, and to different persons, on the theory of an appointment, they ought to be paid in the order of their date, whereas the equity courts have never recognized any such preference. Perhaps the sounder view is, that the chancery courts will treat all debts contracted by herself or for her account, and with her consent, whether written or verbal, as enforceable out of her separate estate. Murray v. Barlee, 3 Myl. & K. 239; 2 Craig & Phil. 48; 22 Wend. 526; 18 B. Monr. 649; 14 ib. 247. In 18 ib., *supra*, the court declined to enforce the contract of the wife as surety for the husband, because it was " *stricte juris*," the surety does not participate in the consideration, it arises upon signing the obligation, and in no wise connects itself with what is antecedent. 2 D. & E. 370; 2 Brown's Ch. 382, 383; 2 Ves. Jr. 542; 3 Wil. 359; 2 Caines' Cas. in Error, 1.

In Daniel v. Robinson, 18 B. Monr. 649, the property was conveyed to the wife "for her sole and separate use." The statute was, that the separate estate could not be incumbered or sold, only by order of a court of equity, and that for exchange and re-investment. It was held that her debts were not chargeable on the estate, her disposition only extended to the income.

The statutes are enabling in so far as they retain to the wife the possession and control of her property, and the use and benefit of its income. To that extent they relieve from the disability of coverture. As to the income and profits, she is under no restriction. She may lease her lands but cannot sell or mortgage them, except by joint deed of her

husband and herself (perhaps, as to movable effects and choses in action, she may sell or assign them, at pleasure). These statutes are restrictive of the equity doctrine that a wife may charge and dispose of her separate property as a *feme sole.* If the property was hers absolutely, at the date of the marriage, the statute withdraws it from the control of the husband, and she holds it, subject to the restrictions of the law, if she acquires it afterward. The law impresses itself as conditions of her tenure, unless the instrument creating the estate otherwise provides. We understand the doctrine in this state to be, that a married woman (unless the instrument creating her estate otherwise provides) holds separate property, whether owned at her marriage or acquired since, as if the 23d, 24th, 25th, 26th and 27th articles of the Code, pp. 335, 336, were embodied in an instrument conferring the property upon her ; these define the nature and extent of her estate, her ability to sell and dispose of it, and her power to charge or bind it for debts. This separate property "consists of real and personal estate, money, rights and credits." "Of every species and description of property." Art. 23, *supra.* It is this separate estate, whether in the form of lands, personal effects or credits, that she may dispose of and alien, or charge with debt, provided each be done according to the terms of the law. If she make a mortgage to secure a "debt contracted for necessaries for herself and children, or for their education," the mortgage is of no effect unless the husband join in it ; while the debt being such as she may contract, may be recoverable out of her property. There is no room for the application of the equitable doctrine, that, by virtue of general contracts and engagements to pay money, she charges, or is deemed as intending to charge, her estate, for the statutes which is as if conditions of her tenure or limitations upon her power over the estate, defines in how far she can act as a *feme sole,* and declares that to that extent she shall charge her property, and by necessary implication, negatives every other mode or any greater extent. If an instrument empowers a married

woman to dispose of property by a deed, attested by two witnesses, * * * a deed attested by one will not suffice. Montgomery v. Agricultural Bank, 10 Smedes & Marsh. 576. Not because the law requires two witnesses, but because the power was prescribed to be executed in a particular way. So, if the statute declares that she may charge her estate with a certain class of debts, contracted for certain enumerated purposes, it is to the exclusion of all others.

The married woman's law of 1839 gave no power to the wife to impose a debt on her separate estate, which consisted only of lands and slaves. In Davis v. Foy, 7 Smedes & Marsh. 67, speaking of the statute, the court say "that its effect is rather to take away all power of subjecting her property to her creditors, except in the particular mode specified in the statute. In Frost v. Doyle, ib. 76, the court declare the purpose of this legislation to be to limit the rule in equity that the wife is a *feme sole* as respects her separate estate, and that its object would be defeated by holding that she could charge the separate estate by note or bond. The cases of Berry v. Bland, ib. 83, and Davis v. Gisk, 9 ib. 151, commenting on the power which a wife has over property settled upon her by deed or will, in accordance with Morgan v. Elam, 4 Yerg. 375, and Doty v. Mitchell, 9 Smedes & Marsh., on the same point, seem to hold the rule to be, that she has no power except what the instrument imparts, and that she is a *feme sole* only so far as she stipulates for exemption from common-law disability. This places her upon narrower ground than the English and the American courts generally assign her. The cases of Garrett v. Dabney, 27 Miss. 343, and Block v. Cross, 36 ib. 558, dissent from the doctrine of the cases in 7 and 9 Smedes & Marsh., *supra*, and place the rule here in accord with the reason and authority of equity courts generally, viz.: "that if the instrument is silent as to her power over the property, neither restricting nor prescribing the mode of charging or disposition, the power is absolute,

and she deals with it as a *feme sole.* Such is, doubtless, the true doctrine. Equity treats her as owner, unembarrassed by coverture. Curil v. Compton, 14 Smedes & Marsh. 58 ; Dalton v. Murphey, 30 Miss. 65 ; Russ v. Wingate, ib. 445 ; Stamp v. Green, 34 ib. 546 ; Steadman v. Holman, ib. 551 ; Scott & Gray v. Pope & Eton, 36 ib. 117 ; Carter v. Whitworth, 43 ib. 61 ; Dunbar v. Meyer, Deutch & Co., ib. 679 ; Bacon v. Bevan, 44 ib. 203 ; Foxworth v. Magee, ib. 430 ; Anderson v. Gregg, ib. 170, give utterance to the same reading of the statute. Article 910 of the Louisiana Civil Code conforms to the current of modern jurisprudence : "The law is obligatory on all the inhabitants of a state, foreigners while residing there, and upon property within its limits." In the Bank of Louisiana v. Farrar, 1 La. Ann. 49, the note and mortgage were dated in Mississippi, but the paper was made payable in Louisiana, and the mortgaged property was situated there, so that it was, in legal effect, a Louisiana contract, and as such dealt with by the court. Article 2412 is to the effect that the wife cannot bind herself conjointly with the husband for debts contracted, before or after marriage, by him. As we understand by the general law of Louisiana a wife, with the consent and concurrence of her husband, can only bind herself where the consideration inures to herself or her estate. Porter v. Silliman, 44 Miss. 282, and cases there cited. It may be observed that article 2412, *supra,* was enacted into law subsequent to the date of the charter of the bank. It was held, however, in Farrar's case, *supra,* that it did not repeal the thirty-second section of the charter. It thus appears that the special law under which this contract was made is in derogation of the general law, and ought, therefore, to be construed strictly, and not carried beyond its reason and policy.

We have reached the conclusion that this contract (on the case made in the record) is not obligatory on Mrs. Williams. Not, however, without difficulty and hesitation.

We realize the importance of the principle and its practical effect in the community. This protracted discussion can only be excused, as it evinces an earnest desire to discover and announce the truth.

*The judgment is affirmed.*