PHINEAS M. GARRETT v. A. L. DABNEY, Judge of the Probate Court, &c.

Where a *feme sole* duly executes a will, which is valid at the time it bears date, but subsequently to the execution of the will she marries:— *Held*, that her subsequent marriage annuls the will, and leaves it no longer subject to the wife's control; nor is the will revived by the death of the husband, the wife surviving.

The estate of a *feme covert*, held under the act of 1839 (Hutch. Co. 496), in relation to the rights of married women, is, in important respects, in a different condition from the separate estate of a married woman in England; because by the provisions of that act the husband is entitled to the control and usufruct of the estate, and in the event of his wife's death without issue of the marriage, he has a vested interest in the property in fee, and if there be issue, they have a vested interest in fee in it; but in England the separate estate is held entirely independently of the husband, as to its use and enjoyment, and he is even accountable for such part of it as comes to his hands, it being considered as belonging to her as a *feme sole*, absolutely excluded from any legal interest or power of the husband.

But where the separate estate of the wife is founded upon the statute of 1839, she is regarded as a *feme sole* in relation to it only so far as she is clothed with such right by the statute, and her right of disposition is confined in its · exercise to the particular mode therein specified.

The same reasons by which the will of a *feme sole* would be revoked at common law by her subsequent marriage, must prevail in relation to a similar will made by a woman holding property under the statute of 1839, and subsequently marrying.

*Quære*— Can a *feme covert* who holds property under the acts of 1839 and 1846, which limit her right of disposing of her property so held to the mode therein specified, under any circumstances dispose of her property by will ?

The act of 1821 (Hutch. Co. 649) which provides that no devise made according to the statute, or any clause thereof, shall be revokable but by the testator or testatrix cancelling or obliterating the same, or causing it to be done in his or her presence, or by a subsequent will, codicil, or declaration in writing, is in substance the same as the 6th section of 29 Chas. 2 :—*Held*, that it is the settled rule .that this statute applies to acts of direct and express revocation, and that a will may be revoked by implication or inference of law by various circumstances, not within the provisions of the statute.

ON appeal from the probate court of Hinds county ; Hon. A. L. Dabney, judge of the probate court of Hinds county.

The opinion of the court contains a sufficient statement of the facts of the case.

*F. Anderson* for appellant.

1. The act of 1821 on the subject of wills does not change the common law so far as *femes covert* are concerned, who, as well before as since that statute, were generally incompetent to make a will. See Hutch. S. C. P. 949, § 14, and authorities cited by counsel for defendants in error.

2. The exceptions to the rule at common law were founded upon the principle, that as to her separate property, she had the *jus disponendi*, unless restrained by the deed or settlement under which she held her separate estate. Those exceptions were, that as to her separate estate, or any property (not being real estate) to which her title was not by the marriage absolutely extinguished, she could make a will; and this rule applied even in those cases where, as under our act of 1839, the husband had the right of survivorship. *West* v. *West*, 3 Rand. 373 ; 2 Brown, Ch. R. 543, 544 ; *Rich* v. *Cockrell*, 9 Vesey, 369 ; 2 Eng. Stat. at Large, 272, 335 ; *Fettyplace* v. *Georges*, 3 Brown, Ch. R. 8 ; *Gove* v. *Knight*, 2 Vern. 535 ; 1 Vesey, 46 ; *Sawyer* v. *Bletso*, 2 Vern. 330 ; 7 S. & M. 68.

Garrett *v.* Dabney.

3. This principle is not, as counsel suppose, overruled in the United States. Upon an examination of the question, as discussed in New York, South Carolina, and Tennessee, it will be seen that the question of the right of a *feme covert* to make a will of separate estate was not involved; the only question in those cases being, how far a married woman was in equity to be treated as a *feme sole*, as to her separate estate; the same question having given rise to much conflict of opinion in the English courts, where, nevertheless, the right to make a will, as to separate property, was not questioned. 3 Johns. Ch. R. 77; 17 Ib. 548; *Morgan* v. *Elam*, 4 Yerg. 375; 9 S. & M. 435. See also, 23 Cushm. 251, 281.

4. By the act of 1839, the wife is vested both with the legal and equitable estate, "in her own name, and as of her own right," and under the authorities has therefore the *jus disponendi*, except so far as restrained by the act. Hutch. Co. 496, 497. She is not, therefore, restrained from making a will as to this separate property, which is good without the husband's assent in case she survive him, and good with his assent in case of his survival; and it is evidently true, that so far as she is capable of making a will during coverture, the fact of marriage is not in law a revocation.

5. The act of 1821 prescribes the mode, and the only mode in which a will shall be revoked, by "destroying, cancelling, obliterating the same," or "by a subsequent will, codicil, or declaration in writing." Hutch. Co. 649, § 15.

On the admissibility of the declarations of Mrs. Reagin, see 1 Jarm. on Wills, 349, 350, 351; 4 Cow. 483; 9 Ib. 208.

The act of 1821, in relation to the revocation of wills, refers to express revocations, and says that revocations of wills shall not be made except in a certain manner. It was not intended to change the law in relation to implied revocations.

*Johnston* and *Shelton* for appellee.

The subsequent marriage of Mrs. Cargill, the testatrix, with Reagin, after making the pretended will in writing, operates in law as a revocation of the instrument. In support of this view we cite the following authorities. 4 Kent's Com. 527; 2 Term

R. 695; Ib. 684; 1 Lomax on Executors and Administrators, 55; Chilton on Probate Law and Practice, p. 75, and the numerous cases there cited; *Methodist Church* v. *Jacques*, 3 Johns. Ch. R. 81; 2 Roper on Husb. and Wife, 68; 3 Des. R. 455.

It cannot be successfully contended that the enactment of the Mississippi legislature, familiarly denominated the "married woman's law," varies this rule, or changes this principle. On the contrary, both of the acts (1839 and 1846) prescribe the mode of descent for a *feme covert's* separate estate, and, designating the mode in which, during coverture, she may alienate her estate, provides that she shall not dispose of it otherwise. We say, then, that our own statutory regulations prohibit a *feme covert* from making a will. Hutch. Co. 497, § 4; Ib. 498, § 6.

Before the passage of the woman's law in 1849, the old statute of Mississippi, prescribing what persons may make a will, expressly excludes married women from doing so. Hutch. Co. 649, § 14.

As to the nuncupative will, which was admitted to probate, at the time Mrs. Reagin made that, she was a *feme sole*, a widow, without issue, and of course was not prohibited by the married woman's law, or any other enactment of the State, from disposing of her property by will.

We submit to the court, that the record fully establishes the entire regularity of the mode adopted for the proof and establishment of the nuncupative will. Hutch. Dig. 650, § 18, &c.

Now as to the question whether real estate passes by a nuncupative will, we deem it sufficient to remark, that that question does not properly arise in this case. The nuncupative will was made; was regularly established and recorded according to law; and, although it does profess to devise real as well as personal estate, still, if good to dispose of the personalty, the mere fact that the will sought also to dispose of real estate, could by no means destroy the force of the instrument, to the extent authorized by law. Moreover, the question as to what passed by this nuncupative will, does not concern the interests of appellants. If the will be valid, so far as the personalty is concerned, and not good as to the lands, that would be a contest

between the devisee under the nuncupative will, and the heirs at law of the testatrix. We doubt not, however, that whatever may be the rule of the common law in reference to that question, that here, in Mississippi, under our statutory regulations, there is no provision restricting nuncupative wills to a disposition of personalty. Every species of property may pass by such wills. Hutch Co. 650, § 18.

In confirmation of this view, and also for the purpose of showing the regularity of all the proceedings in the probate court, touching the probate of this nuncupative will, we refer to *Parkison et al.* v. *Parkison*, 12 S. & M. 672.

*Tarpley* on the same side.

A *feme covert*, by deed of settlement made prior to her marriage, and vesting her estate in trustees, may be clothed with testamentary disposition of her lands, and a court of chancery will enforce such a power made during coverture, under the name of an appointment, or execution of a trust. 4 Kent's Com. 559.

The statute of frauds provides that a will can only be revoked, either by another instrument, or by burning, cancelling, tearing, or obliterating (the very words used in our statute, 15th section). But a will may be revoked by implication, or operation of law, and these revocations are not within the purview of the statute. 4 Kent's Com. 581. Hence the subsequent marriage and birth of a child will by operation of law be a revocation. Ib. 582. So also the will of a *feme sole* is revoked by her marriage. Ib. 588.

These authorities are cited to prove that the 15th section of the statute of 1821 was intended to apply to express revocations of wills where the party, by some act in connection with, or in reference to the will, desired to revoke it, but was not intended to apply to revocations created by operation of law growing out of the subsequent acts of the testator.

Admitting the will to have been executed during the widowhood of Mrs. Cargill, her marriage with Reagin was an implied revocation of such will, which rendered it null and void. See 1 Lomax on Executors, 55; Toller on Executors, 19; Lovel

on Wills, 196 (top page); *Hodsden* v. *Lloyd*, 2 Bro. C. C. R. 534; *Cotter* v. *Lager*, 2 P. Wms. 624; *Doe* v. *Staple*, 2 T. R. 684; 1 Sug. on Pow. 194, 349; Roper on Property, 69; *Hinckley* v. *Simmons*, 4 Vesey, 160.

Mr. Justice HANDY delivered the opinion of the court.

At the September term, 1852, of the probate court of Hinds county, the appellee filed his petition for the probate of the nuncupative will of Mrs. Cecilia Reagin, made on the 8th of August, 1852, by which the greater part of her estate was bequeathed to the appellee. At the same term, the appellants appeared and filed an answer to the petition, resisting the probate of this nuncupative will, and alleging that the testatrix, on the 20th day of July, 1844, while she was *sole* and the widow of William Cargill, deceased, and of lawful age, duly made and published her last will and testament in writing, attested and signed according to law, by which she left her estate, both real and personal, to be divided between Thomas J. Ragan and the appellants, and appointing Thomas J. Ragan and Phineas M. Garrett her executors; and praying that this written will should be admitted to probate, and letters testamentary granted to the appellant Garrett. At the same term, the appellee filed a response to this answer, charging that the alleged written will was never in fact made or published by the testatrix, but was fraudulent and void; and further alleging that, after the date of the pretended will, the testatrix was duly married to Thomas J. Reagin, on the 24th of July, 1844, and that they lived together as husband and wife until the death of Reagin, which occurred about the 9th of November, 1847, after which, and at the time of executing the nuncupative will, the testatrix remained *sole*, and that after that marriage there was never any republication of the alleged written will, and insisting that, if that will was in truth executed as alleged, it was revoked and annulled in law by the subsequent marriage.

At the hearing the requisite legal proof was adduced to establish the due execution of the nuncupative will.

In support of the written will, the appellant, Phineas M. Garrett, was sworn, and testified in substance, that on the evening

of the day the will bears date, he and Mrs. Clark, (who, with Thomas J. Reagin, are the subscribing witnesses,) were sent for to go and see Mrs. Cargill, who was sick, and they went and found her sick in bed, and she said she desired to make her will. After some conversation he left the room and retired for the night, but about 11 o'clock was called upon to write the will. Reagin, the overseer, was also sent for. By her request, the witness proceeded to write the will as she directed, and after it was written she said it was as she wanted it. She being unable to write, witness, at her request, signed her name, and she made her mark, and requested Mrs. Clark, Reagin, and witness, to subscribe it as witnesses, which they did. The seal affixed to the name of the testatrix is in blue ink, and also the alteration of the figures 1843 to 1844, written on the back of the will, because there were two bottles of ink on the table, the other parts of the will being written with the black ink, and the seal and alteration of figures on the back being written with the blue; but it was done inadvertently, and at the time of execution of the will. He testifies to her mental capacity, and to the necessary formalities in executing the will, and that it was signed by the persons whose names appear as subscribing witnesses to it.

Elizabeth Clark, one of the subscribing witnesses, testified the same in substance as Garrett, and stated further on cross-examination, that after the will was completed, Mrs. Cargill requested witness to keep it, and placed it in her hand; that she kept it for some time, and delivered it to Garrett to keep, thinking it would be safer in his hands; that Mrs. Cargill and witness had ceased to visit each other for some two years previous, and that Mrs. Cargill never mentioned the will after witness took it or called for it.

Garrett stated on cross-examination that Mrs. Clark delivered him the will to keep some time after its execution, and that he had kept it ever since, without alteration or addition; that it was delivered to him by Mrs. Clark some time after witness's house was burned.

The original written will sent to this court from the court below, shows that the property of the testatrix is bequeathed in

29 *

part to the children of Garrett; that in the body of the instrument the name of Reagin, written by Garrett, is spelled Ragan, and is also spelled in the same way in the signature as, a subscribing witness.

In behalf of the appellee, six original writings having the genuine signature of Reagin to them were produced, and have been sent here with the transcript of the record. They consist of the marriage bond of Reagin, and documents signed by him and sworn to in court. In all these signatures his name is spelled Reagin. Besides the blue ink used in making the scroll as a seal to the written will and in altering the date on the back of it, the words showing the date of the will, " this 20th day of July, 1844," appear to be written with black ink of a different hue, and with a different pen from the body of the instrument.

He also proved by a witness, Rhodes, that in December, 1839, he went to live with Mrs. Reagin, and that she repeatedly told him that Garrett wanted her to sign the paper as a will, but that she had not done so, and never intended to sign it; that she would not give Garrett or his children any thing; that she also repeatedly said to witness, that Thomas J. Reagin was not present when Garrett drew up and presented the will, Garrett and Mrs. Clark alone being present; that Mrs. Reagin had no social intercourse with Garrett or his family from the time witness went there to live. This testimony was objected to by the appellant, but admitted by the court.

The court rejected the written will, and decreed that the nuncupative will should be admitted to probate, and from that decree this appeal is prosecuted.

The first question to be considered is, whether the written will dated in July, 1844, was annulled by the subsequent marriage of Mrs. Cargill to Reagin, conceding that it was a valid will and duly executed at the time it bears date.

The affirmative of this proposition is undoubtedly true by the rules of the common law, and the reason of it is that the marriage destroys the ambulatory nature of the will, and leaves it no longer subject to the wife's control. · 4 Kent's Com. 527; 2 Roper on Husband and Wife, 68. Moreover, by the marriage, the wife's chattels vest in the husband, which puts an end to the will.

It is also clear that by the same rules, the will is not revived by the death of the husband, the wife surviving. *Hodsden* v. *Lloyd*, 2 Bro. C. C. 534; *Doe* v. *Staple*, 2 T. R. 684; 2 Roper, Husband and Wife, 69; *Long* v. *Aldred*, 3 Addams, 48; 1 Lomax, Ex's, 55, unless republication be made.   1 Bright, Husband and Wife, 12.

But it is insisted in behalf of the appellants, first, that by the law as settled in England, these rules did not apply to cases where the *feme covert* held property as her separate estate, and that as to such property, she had the absolute *jus disponendi* unless restrained by the deed or settlement under which she held the separate estate, and might alienate it by will or otherwise ; and, second, that by our statute of 1839, the wife is vested with the legal and equitable estate " in her own name and as of her own right," and has the same power of disposition and absolute property as existed in England in case of a *feme covert* having separate estate, except so far as she is restrained by that act.

Let us examine these positions and see how far they are correct, and how far applicable under our laws.

The principle deduced from the adjudications upon this point in England, is thus stated by the court of errors of New York, in the very ably argued case of *Jaques* v. *Methodist Episcopal Church*, 17 J. R. 585, " that a *feme covert*, having a separate estate, is to be regarded as a *feme sole*, as to her right of contracting for or disposing of it.   The *jus disponendi* is incident to her separate property, and follows of course by implication. She may give it to whom she pleases, or charge it with the debts of her husband, provided no undue influence be exerted over her, and her disposition of it will be sanctioned and enforced by a court of equity, without the assent of her trustee, unless the assent be expressly made necessary by the instrument creating the trust.   And the specification of any particular mode of exercising her disposing power, does not deprive her of any other mode of using that right, not expressly or by necessary construction negatived by the devise or deed of settlement." The same doctrine is also sanctioned by high authorities in this country.

But this class of cases goes upon the principle of absolute

exclusion of all interest on the part of the husband in the separate estate, and regards the wife as vested with the power of a *feme sole*, to all intents and purposes, in relation to it, and hence is deduced to her the power to make a will as to her separate estate, unless prohibited expressly or by necessary implication in the instrument creating or securing the estate.

It is also held in England that the husband may empower his wife to dispose of her personal estate and choses in action by will, upon the principle that he may waive the interest which the law secures to him in her property, disabling her from disposing of it during marriage. But in such case, if he die before his wife, the will becomes void as to her next of kin, and she will be considered as having died intestate, unless she make a disposition of the property after his death. 1 Roper, Husband and Wife, 170.

For these reasons and under these circumstances alone, does it appear that a married woman had the power to make a will and dispose of any property in which her husband had an interest. And if this were the condition of the law of this State, it would seem that the marriage of a *feme sole* having a separate estate secured to her, would not annul her will previously made.

But the estate of a *feme covert* held under the act of 1839, in relation to the rights of married women, is, in important respects, in a different condition from the separate estate of a married woman in England. The first and most important difference is, that by the provisions of that act, the husband is entitled to the control and usufruct of the estate, and, in the event of the wife's death without issue of the marriage, he has a vested interest in the property in fee, and if there be issue, they have a vested interest in it in fee. *Lyon* v. *Nott*, decided at last term. But in England, the separate estate is held entirely independently of the husband as to its use and enjoyment, and he is even accountable for such part of it as comes to his hands. 2 Kent's Com. 164. Her choses in action, not reduced to possession during coverture, and not part of her separate estate, vested in him, if he survived her, in virtue of his marital rights; but her separate estate was considered, to all intents

and purposes, as belonging to her as a *feme sole*, absolutely excluded from any legal interest or power of the husband. But where the separate estate of the wife is founded upon our statute, she is regarded as a *feme sole* in relation to it only so far as she is clothed with such rights by the statute, and among other things, that her right of disposition is confined in its exercise to the particular mode therein specified. These distinctions have been held by numerous decisions of this court.

Hence it is clear that the husband bears a very different relation to the property of the wife held to her separate use under the provisions of this statute, from what he bore to the separate estate of the wife under appointments or settlements in England. Under our law, he has a present, fixed interest in, and right of enjoyment of, the estate, with a vested interest in remainder in fee, in case of the wife's death without issue of the marriage; and if there should be children of the marriage, they have a vested interest in fee in the estate to take place upon her death. These rights vest in the husband and children immediately upon the marriage as essentially as though they had been expressly secured by marriage settlement. They could not be defeated by any act of the wife; and they put an end to any right of the wife inconsistent with them. They also must necessarily annul any previous disposition or alienation of the property of a prospective character, and under which no rights had become vested, because such a disposition would be wholly incompatible with the rights vested in the husband and children, and would necessarily defeat them.

One of the reasons why a marriage revoked the will of a *feme sole* at common law was, that by the marriage the chattels of the wife passed to the husband. The same principle applies where a partial interest vests by the marriage inconsistent with the right of absolute disposition; for she could no more defeat a fixed and present right existing to a limited extent than one extending to the entire estate. In either case the disposition must defeat the rights vested; first, the usufruct of the husband for life; second, the vested interest in fee to the children upon her death; and third, the vested interest in re-

mainder in fee to the husband on failure of issue of the marriage. It is manifest that the existence of any of these rights would deprive her of the power of disposition, but united, they constitute the entire estate, and place it, to all intents and purposes, beyond her control. It is, therefore, manifest that the same reasons by which the will of a *feme sole* was revoked by her subsequent marriage at common law must prevail in relation to a similar will made by a woman holding property under the statute of 1839, and subsequently marrying.

This conclusion would be much strengthened if the *feme covert* should be held to be incapable of disposing of her property by will under any circumstances. It has been urged with much force in argument, that no such power exists under our laws, and that her right of disposing of her property held under the acts of 1839 and 1846, is limited by those statutes to the mode therein specified, to wit, the joint deed of the husband and wife, and that no other mode of disposition can be sanctioned.

This is a question of great importance, and as the case here made does not properly present it, we do not consider it necessary or proper to decide it on this occasion.

It is urged by the counsel for the appellants, that the common law rule, that the marriage revokes the will of a woman made before marriage, is changed by the act of 1821, which provides that " no devise made " according to the statute, " or any clause thereof shall be revocable but by the testator or testatrix cancelling or obliterating the same, or causing it to be done in his or her presence, or by a subsequent will, codicil, or declaration in writing made as aforesaid." Hutch. Co. 649.

This statute is, in substance, the same as the 6th section of 29 Charles 2. But notwithstanding that statute and others to the same effect in this country, it is well settled in England and the United States, that the statute applies to acts of direct and express revocation, and that a will may be revoked by implication or inference of law by various circumstances not within the purview of the statute. *Christopher* v. *Christopher*, Dick. R. 445 ; *Doe* v. *Lancashire*, 7 T. R. 49 ; 4 J. C. R. 507 ;

among which is included the subsequent marriage of the woman. 4 Kent's Com. 527; 12 Mass. 526. A doctrine so firmly settled, we do not feel disposed to call in question.

We are, therefore, of opinion that though the written will offered for probate in this case, were the genuine will of the testatrix at the time of its date, yet it was revoked and annulled by her subsequent marriage.

This view of the case renders it unnecessary to determine the question whether the written will was false and fraudulent.

The decree of the probate court is affirmed.