# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 2000-CT-01779-SCT

*THELMA M. HINDERS, JOYCE H. STAMPS AND JOAN H. REINHARD*

*v.*

*JOYCE LYNNE HINDERS*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 09/22/2000 |
| TRIAL JUDGE: | HON. GAIL SHAW-PIERSON |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | GREGORY MOREAU JOHNSTON |
| | LEM G. ADAMS, III |
| ATTORNEY FOR APPELLEE: | ANSELM J. McLAURIN |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS AND ESTATES |
| DISPOSITION: | AFFIRMED - 10/24/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1. The Madison County Chancery Court found that a testator's pre-divorce will leaving everything to his ex-wife remained a valid will, not expressly or impliedly revoked by the subsequent execution of a property settlement agreement prepared in conjunction with an irreconcilable differences divorce proceeding. Certain heirs-at-law of the testator appealed the chancellor's decision to this Court, which assigned the case to the Court of Appeals. The Court of Appeals affirmed the trial court's judgment. This Court granted certiorari to consider under what circumstances a pre-divorce will is revoked by a divorce accompanied by a property settlement agreement inconsistent with the will. We decline to adopt a rule of automatic revocation in such a case, but attempt instead to clarify the current status of the law of implied revocation. In doing so, we affirm the judgment of the Court of Appeals.

### FACTS AND PROCEEDINGS BELOW

¶2. On December 6, 1993, John A. Hinders (John), and his wife, Joyce Lynne Hinders (Joy), executed very basic "compatible" one-page wills leaving everything to each other. It is undisputed that the wills met the requirements of Miss. Code Ann. § 91-5-1 (1994). In John's will, he directed that Joy serve as executrix without having to post bond or make an accounting, and he "devise[d] and bequeath[ed] all of my property, real personal or mixed and wherever situated unto my wife, JOYCE L. HINDERS."

¶3. John and Joy separated in February, 1995, and divorced on August 25, 1995, after 27 years of marriage. No children were born to the marriage. Prior to the entry of the final divorce decree, John and

Joy executed an eight-page "Separation and Property Settlement Agreement" (property agreement) on August 11, 1995. The prior wills were not mentioned in the property agreement. After the divorce, it appears undisputed from the record that the terms of the property agreement were fulfilled[1] and that John and Joy never thereafter lived together.[2] Without ever canceling his 1993 will or executing a new will, John suddenly and tragically died from an aneurism on February 11, 1999.

¶4. On the next day, February 12, 1999, Joy filed a Petition to Probate Will and Appoint Executrix in the Chancery Court of Rankin County, Mississippi.[3] This case was assigned cause number 45,710. On the same day, a Decree Admitting Will to Probate and Appointing Executrix was entered, and Letters Testamentary issued. On March 3, 1999, Joy filed a Motion for Authority to Vote Stock based on the allegation that John was the sole owner of outstanding stock in J.J.H., Inc., a Mississippi corporation which served as franchise operator for the McDonald's Restaurants in Brandon and Flowood.[4] On the same date, the Rankin County chancellor signed an order authorizing Joy to vote the stock. On March 9, 1999, Joy filed a Motion for Authority to Sell Assets, and on the same date, the chancellor signed an order granting Joy the authority to sell the restaurant assets of J.J.H., Inc. in accordance with a purchase and sale agreement between McDonald's Corporation, J.J.H., Inc., and John's estate. This flurry of activity by Joy quickly got the attention of John's mother and siblings, because on March 17, 1999, they filed a Motion to Intervene and to Set Aside Order Authorizing Sale of Assets, and on March 24, 1999, they filed a Motion to Dismiss Probate Proceedings.[5] On March 17, 1999, the same heirs-at-law, Thelma M. Hinders (Thelma), Joyce H. Stamps (Joyce), and Joan H. Reinhard (Joan), commenced a separate action by filing a complaint in cause number 45,880 on the docket of the Chancery Court of Rankin County. In this complaint, Thelma, Joyce and Joan sought relief via the chancery court's declaration that John's will of December 6, 1993, had been revoked by the property agreement of August 11, 1995 (executed during the divorce proceedings), thereby causing John to have died intestate, with his heirs-at-law to inherit from John, exclusive of Joy, since Joy had received assets from John through the property agreement. Once again, James, Jennifer, Jane and Judy each filed in this new cause a waiver of process and general entry of appearance. By May 5, 1999, it came to light that John had a fixed place of residence in Madison County, Mississippi, at the time of his death; therefore, finding that John's will must be probated by the Chancery Court of Madison County, pursuant to Miss. Code Ann. § 91-7-1 (1994), the Rankin County chancellor, by order dated May 5, 1999, transferred cause number 45,710 to the Madison County Chancery Court. By order dated September 8, 1999, the Rankin County chancellor transferred cause number 45,880 to the Madison County Chancery Court.

¶5. Based on the Pre-Trial Order and Amended Pre-Trial Order filed in the Chancery Court of Madison County (Cause Number 99-650), it appears that the two original causes were consolidated for trial purposes. On September 29, 1999, the Madison County Chancery Court conducted a hearing on what had by now become a will contest.

¶6. In an effort to have John's will revoked, the heirs-at-law called as witnesses Joy Hinders (John's ex-wife, called as an adverse witness), Judy Goolsby (who had lived with John for about 3 years prior to his death), Thelma Hinders (John's mother), Judith Ann (Judy) Reynolds (John's sister), and Joyce Stamps (John's sister). In response, Joy testified and also called as witnesses Tony Raffa (John's long-time friend since high school), and Richard Sparkman (John's certified public accountant). In the end, the chancellor took this cause under advisement and ultimately entered a detailed seven-page order dated September 22, 2000, and filed for record on September 26, 2000. In her order, the chancellor made findings of fact, cited the statutes and case law considered by her, and concluded, inter alia, that the execution of the property

agreement did not expressly or impliedly revoke John's prior will, nor was there any evidence to justify a finding that John's conduct established his express or implied intent to revoke the will. The chancellor held:

> that the will of John A. Hinders remains a valid will and the property settlement agreement executed by the (sic) John and Joyce Hinders does not operate to expressly or impliedly revoke the will dated December 6, 1993 in which Joyce L. Hinders, his former wife, was the sole beneficiary.

¶7. It is from this order of the Madison County Chancery Court that the heirs-at-law appealed.

## PROCEEDINGS BEFORE THE COURT OF APPEALS

¶8. Before the Court of Appeals, John's heirs-at-law argued that the trial court had erred (1) in making incorrect conclusions of law thereby requiring a non-deferential de novo appellate review, (2) in failing to apply the rule of law that a divorce revokes the provisions of a will of a deceased for the benefit of the ex-spouse, (3) in holding that John's prior will for the benefit of Joy was not impliedly revoked by the property agreement executed by John and Joy during the divorce proceedings and by John's subsequent acts of revocation, (4) in holding that John's prior will for the benefit of Joy was not expressly revoked by the property agreement, and (5) in failing to address whether Joy breached the property agreement.

¶9. The Court of Appeals held (1) that current Mississippi law does not provide for automatic revocation of a pre-divorce will due to a subsequent divorce accompanied by a property settlement agreement containing provisions inconsistent with the will, ***Rasco v. Estate of Rasco***, 501 So.2d 421 (Miss. 1987); (2) that based on the evidence and the law, the chancellor was not manifestly in error in finding that John had not impliedly revoked his 1993 will, ***Bower v. Bower***, 758 So.2d 405, 412 (Miss. 2000); ***In re Estate of Cannon***, 733 So.2d 245, 248 (Miss. 1999); ***Estate of Lyles***, 615 So.2d 1186, 1188 (Miss. 1993); ***Rasco v. Estate of Rasco***, 501 So.2d 421, 423 (Miss. 1987); ***Matter of Will of Palmer***, 359 So.2d 752 (Miss. 1978); ***Cain v. Cain***, 795 So.2d 614, 617 (Miss. Ct. App. 2001); and (3) that Joy did not breach the terms of the property agreement by attempting to take under John's will.

## PETITION FOR WRIT OF CERTIORARI

¶10. In their petition for writ of certiorari before this Court, the heirs-at-law narrow the issues. They claim that (1) the Court of Appeals correctly found that the issue of automatic revocation is one of broad public importance requiring determination by this Court, (2) the Court of Appeals failed to follow the ***Rasco*** decision which purportedly held that a divorce accompanied by a property settlement agreement which is fully carried out results in a revocation (at least by implication) of the provisions of a pre-divorce will in favor of the ex-spouse, and (3) the Court of Appeals did not conduct a non-deferential de novo review of the chancellor's decision since the decision was based on incorrect conclusions of law.

## DISCUSSION

¶11. The second issue is dispositive for our purposes and is the only issue that merits discussion. This issue can be clearly stated as:

> **I. WHETHER A PRE-DIVORCE WILL CONTAINING PROVISIONS INCONSISTENT WITH A SUBSEQUENT PROPERTY SETTLEMENT AGREEMENT IN A DIVORCE PROCEEDING IS REVOKED AUTOMATICALLY, OR BY IMPLICATION**.

¶12. We quickly put to rest the issue regarding automatic revocation. In their brief before the Court of Appeals, the heirs-at-law stated that many states have adopted the rule of revocation by divorce, either by statute or case law. However, Mississippi has no such statute, and based on our existing statutes concerning revocation of wills, as well as the current case law, it would be judicially imprudent to consider revocation by divorce. For the same reasons, it would be inappropriate to hold that a pre-divorce will is automatically revoked by a divorce accompanied by a property settlement agreement with provisions inconsistent with the terms of the pre-divorce will. Instead the issue quickly becomes whether a pre-divorce will is impliedly revoked by a subsequent divorce accompanied by a property settlement agreement containing provisions inconsistent with the terms of the pre-divorce will. On this issue, the Court of Appeals correctly points out:

> Rather than treat that factual situation as an automatic revocation, the Mississippi Supreme Court has simply weighed those facts, along with others deemed relevant by the court, to discern whether there was an implied revocation of the will. *Rasco v. Estate of Rasco*, 501 So.2d 421, 423 (Miss. 1987).

*Hinders v. Hinders,* No. 2000-CA-01779-COA, 2002 WL 18272 at ¶ 4 (Miss. Ct. App. Jan. 8, 2002).

¶13. Not surprisingly, all parties rely on our decision in *Rasco*, in support of their respective positions. A recitation of the facts in *Rasco* is necessary here. Kay Leigh Rasco (Kay) and Richard Rasco (Richard) married. Kay had three children by a previous marriage. In his will dated June 29, 1981, Richard made certain bequests to Kay's three children, but devised the bulk of his estate to Kay, who was also named in the will as executrix. On April 13, 1982, the DeSoto County Chancery Court granted a divorce to Kay and Richard on the grounds of irreconcilable differences, and there was also a property agreement. This agreement was to be:

> "a full, final and complete settlement of all their property rights, and. . . full and complete settlement of the controversy over the property rights of the parties, and save the right of either party to prosecute his or her suit for complete divorce, this settlement and agreement is and forever after shall be a bar to any suit at law or otherwise for anything growing out of the marriage relation of the parties as well as the property rights of the one against the other."

*Rasco*, 501 So.2d at 422. The terms of the Rascos' property agreement are not important to our discussion here, but there is an interesting twist in *Rasco* which does not exist in the case sub judice. Richard died on November 24, 1982; however, notwithstanding the divorce and property agreement, from the date of the divorce until the date of Richard's death, Kay and Richard continued to live together, even sleeping in the same bed, and failed to carry out the terms of the property agreement. In finding no intent by Richard to justify an implied revocation of his pre-divorce will, this Court referred to a Tennessee case and stated:

> In a recent Tennessee case, *In Re Estate of Perigen*, 653 S.W.2d 717 (Tenn. 1983), the lower court held a will was revoked by implication, due to a subsequent divorce accompanied by a property settlement. On appeal, the Tennessee Supreme Court noted that provisions of the property settlement agreement had not been carried out and that the spouses had cohabitated [sic] until the husband's death. The Tennessee Court ruled:
>
> [G]enerally a divorce accompanied by a property settlement agreement which is fully carried out according to its terms should have the effect of revoking a prior will in favor of a former spouse, especially where the parties thereafter "sever all ties," .... Where the property settlement agreement is

not carried out or even attempted to be implemented, as in the present case, however, we do not think that the rule of the [implied revocation] is necessarily controlling.

653 S.W.2d at 720.

*Rasco*, 501 So.2d at 424.

¶14. Armed with this pronouncement from this Court, the heirs-at-law in the case sub judice deduce that when confronted with the divorced parties' severance of all ties and fulfillment of the property agreement, this Court would conversely hold that there was an implied revocation of any pre-divorce will. In fact, in their petition for writ of certiorari before this Court, the heirs-at-law state:

When addressing the issue of implied revocation, this Court's decision in *Rasco* presents three (3) requirements for a finding of implied revocation: (1) a divorce; (2) a property settlement agreement; and (3) a fulfillment of the terms of the property settlement agreement. According to this Court, the presence of these three (3) elements ". . . should have the effect of revoking a prior will in favor of a former spouse . . ." *Rasco*, 501 So.2d at 423-24 (quoting *In Re Estate of Perigen*, 653 S.W.2d 717,720 (Tenn. 1983)) . . . . . The *Rasco* Court went on to say that implied revocation is clear "**especially** where the parties sever all ties." *Id.* (emphasis added). But, as indicated by the word "especially," this Court offered the severing of ties not as a required element, but rather an enhancing factor, the absence of which does not preclude a finding of implied revocation.

It is apparent from this argument that the heirs-at-law posit that the law in *Rasco* provides that in a will contest, once there is proof of a divorce, a property settlement agreement, and a fulfillment of the terms of the property settlement agreement, the assured result, as a matter of law, is that there is an implied revocation of the pre-divorce will. However, the heirs-at-law misconstrue our holding in *Rasco*.

¶15. In *Rasco*, this Court, inter alia, (1) acknowledged that revocation of wills in Mississippi is governed by statute (Miss. Code Ann. § 91-5-3); (2) acknowledged that in certain cases the facts may bring about "an implied revocation by operation of law;[6] acknowledged that this Court had held "that revocation of a will must be accomplished in some competent manner by the testator, or someone acting for him in his presence . . .;"[7] and, acknowledged that prior pronouncements from this Court "held that a divorce with a property settlement agreement would not operate to impliedly revoke a prior will unless the settlement evidenced the testator's intent to do so."[8] *Rasco*, 501 So.2d at 423. The *Rasco* Court quoted from *McKnight v. McKnight*, 267 So. 2d 315 (Miss. 1972):

A reading of the cases from the jurisdictions which recognize the doctrine will reveal that most of the courts hold that implicit in the determination of whether the property settlement shall impliedly revoke the will (at least as to legacies to the divorced spouse) is the question of whether the testator intended that the settlement should operate as a fulfillment of support rights or as an ademption of a prior-created legacy and release by the divorced spouse of all rights in the deceased's estate. 267 So.2d at 317.

*Rasco*, 501 So.2d at 423. Additionally this Court stated in *Rasco* that it reviewed the Rasco will and settlement agreement "in light of the surrounding circumstances" and noted "that any document presented as a subsequent declaration must reveal by 'clear and unequivocable' [sic, unequivocal] evidence, an intention to revoke the will." *Id.* at 424. This Court further stated:

Looking to the facts and circumstances of this case, the terms of the will itself, the divorce decree and the property settlement, ***and the conduct of the parties,*** this Court finds no intent to warrant the implied revocation of Rasco's will.

*Id.* at 424 (emphasis added).

¶16. The heirs-at-law argue that the "severing all ties" factor found in ***Rasco*** is not an added (fourth) element required to prove implied revocation, but "rather an enhancing factor, the absence of which does not preclude a finding of implied revocation." The heirs-at-law further argue that the Court of Appeals erroneously elevated this "enhancing factor" to "the tantamount element required for a finding of implied revocation."

¶17. However, the Court of Appeals correctly applied ***Rasco*** to the facts in the case sub judice, and the heirs-at-law again misconstrue the pronouncements in ***Rasco***.

¶18. While we correctly relied on the Tennessee case of ***In Re Estate of Perigen*** in reaching our decision in ***Rasco***, such reliance does not, as the heirs-at-law suggest, bring us to the conclusion that there is an implied revocation of John's will because of fulfillment of the terms of the property settlement agreement and severance of all ties by John and Joy.[9] First of all, the Tennessee Supreme Court in ***Perigen*** acknowledged the Tennessee rule "that a divorce and property settlement between spouses operated as a matter of law to revoke provisions in a pre-existing will of one spouse in favor of the other" was one of judicial fiat, 653 S.W.2d at 719 (citing ***Rankin v. McDearmon***, 38 Tenn.App. 160, 270 S.W.2d 660 (1953), a Tennessee Court of Appeals case), inasmuch as "Tennessee has no general statute governing the revocation of wills. A testamentary instrument may be revoked by the testator in various ways, such as destruction, mutilation, or the execution of a later will. *See **Price v. Price***, 37 Tenn.App. 690, 694, 269 S.W.2d 920, 921-22 (1954)." ***Perigen***, 653 S.W.2d at 719.

¶19. Mississippi has a statute governing revocation of wills. Miss. Code Ann. § 91-5-3 (1994) provides in pertinent part:

A devise so made, or any clause thereof, shall not be revocable but by the testator or testatrix destroying, canceling, or obliterating the same, or causing it to be done in his or her presence, or by subsequent will, codicil, or declaration, in writing, made and executed.

¶20. In ***Rasco,*** we acknowledged that this statute was not an exclusive statement on the ways in which a will could be revoked in this state. 501 So.2d at 423. However, certainly, this statute represents a clear legislative mandate which must be followed in conjunction with our judicially created factors concerning revocation of wills.

¶21. We turn to the facts of the case before us today. John and Joy executed their property settlement agreement on August 11, 1995, and they were divorced on August 25, 1995. The property agreement provided, inter alia, that John would pay Joy $5,000 per month in permanent periodic alimony, to be reduced to $2,500 per month if Joy re-married; that if John or his estate sold any of the McDonald's franchises, Joy would receive no sum from the sale of the Pearl franchise, $75,000 upon the sale of the Brandon franchise, and $75,000 upon the sale of the Flowood franchise; that John and Joy would each receive one-half of the net proceeds from the sale of the marital domicile, and would be responsible for their respective federal and state income taxes if a replacement residence were not purchased by either; that

there was a confirmation of a satisfactory division of household goods and furnishings; that John would cause Joy to remain as an insured under a health insurance policy by meeting certain conditions; that John would keep in force a $50,000 life insurance policy with Joy has the named beneficiary; that John would transfer to Joy, free and clear of all liens, the Chevrolet Suburban being driven by her; that Joy would relinquish any claim to John's Mercedes SEL Sports coupe; that Joy would transfer to John any interest or title she had in a Sea Ray boat, with John assuming all liability; that John would transfer to Joy any interest he had in Joy's horse and horse trailer; that John and Joy would each own their respective IRA accounts, disclaiming any interest in the other's IRA account; that John would indemnify Joy from any liability on any McDonald's franchise or lease agreements; that John would receive the monthly payments on a promissory note executed by two individuals, but with John and Joy equally dividing the balloon payment or any early re-payment of the promissory note; that John would pay Joy's attorneys' fees incurred concerning the divorce and property agreement; and, that John would be responsible for any additional federal or state income taxes imposed against John and Joy as a result of subsequent audits by the IRS or the State Tax Commission.

¶22. There is no dispute that John basically complied with the property agreement, with the exception of the life insurance policy, which John assigned to the bank as collateral when he was refinancing the McDonald's restaurants. On the other hand, Joy admits that notwithstanding the provisions of the property agreement concerning the IRA accounts, she did in fact, shortly after John's death, withdraw $13,000 from John's IRA account (she was still the named beneficiary), and Joy also withdrew $22,000 from John's checking account (again, Joy was still listed also on that account).

¶23. After the divorce, John and Joy never thereafter lived together, and in fact, after the divorce, both John and Joy commenced long-term live-in relationships with others.

¶24. It is obvious that in the case of John and Joy, there was (1) a divorce (2) a property settlement agreement, and (3) a fulfillment of the terms of the property settlement agreement. Also, John and Joy never lived together after the divorce. Accordingly, the heirs-at-law would have us stop here and declare an implied revocation of John's pre-divorce will, and further declare that John, therefore, died intestate thereby meaning that John's heirs-at-law would inherit John's estate, with Joy being limited to the provisions of the property agreement concerning what she would receive. In fact, the heirs-at-law state that Joy is precluded by the terms of the property agreement from receiving anything other than what is provided for in the property agreement, based on the following provisions in the property agreement:

16.

This Agreement shall be binding upon the Husband and Wife and also upon their heirs, estates, successors and assigns.

17.

This Agreement constitutes the entire agreement between the parties and each party acknowledges that there are no other or further agreements not expressly included herein . . .

. . . .

20.

. . . this Agreement shall estop and preclude either party from making other or further demands and claims upon the other not included herein . . .

However, notwithstanding the aforementioned terms of the property agreement, and notwithstanding the existence of a divorce, a property settlement agreement, and fulfillment of the terms of the property agreement, our inquiry does not stop. To determine whether there is an implied revocation of John's pre-divorce will, we are bound by *Rasco* to look "to the facts and circumstances of this case, the terms of the will itself, the divorce decree and the property settlement, and the conduct of the parties." 501 So.2d at 424.

¶25. The heirs-at-law emphasize John's regular payment of alimony, the sale of the marital home and Joy receiving half the proceeds, their personal property being distributed according to the agreement, John paying Joy's health insurance, Joy receiving title to a Chevy Suburban after John finished making the payments, John keeping a boat and Joy keeping a horse and horse trailer, John assuming all liabilities for certain restaurants, Joy receiving half the proceeds of a promissory note owed to John for the sale of property and John paying Joy's attorney fees in the divorce action. They also note that both John and Joy had moved on to serious personal relationships with others by the time of John's death, thereby "severing their ties" with each other.

¶26. Joy emphasizes that John, an astute businessman, never revoked or attempted to destroy his 1993 pre-divorce will, but instead, he kept this will in his possession, readily at hand in his desk drawer, and John never had another will prepared, despite advice from his live-in companion to do so and annual reminders from his accountant to update his will.[(10)] John left Joy as a joint account holder on both his corporate and personal checking accounts. John kept Joy as the beneficiary on his IRA account and had his accounting firm continue to prepare Joy's personal tax returns at his expense. Also there was evidence that John would quite often personally deliver the alimony checks to Joy, supposedly to check on her well-being, and that he continued to express emotional feelings for Joy.

¶27. We certainly take note of the existence of the aforementioned paragraphs 16, 17, and 20 in the property agreement of John and Joy, which paragraphs are utilized by the heirs-at-law to opine that John intended through the property agreement to revoke any will or other writing which might contain provisions inconsistent with the property agreement. However, we must remember that in *Rasco*, there was similar language in the Rascos' property agreement. Again, in *Rasco*, we looked not only at the will and property agreement but we looked also beyond these documents to consider the facts and circumstances of the case and the conduct of the parties. We find further language in *Rasco* compelling here:

> This Court notes that any document presented as a subsequent declaration must reveal by `clear and unequivocal evidence, an intention to revoke the will. *Matter of Will of Palmer*, 359 So.2d 752 (Miss. 1978); *McCormack v. Warren*, 228 Miss. 617, 89 So.2d 702 (1956). Proof of intent or reference to the prior testamentary instrument is simply not present in the divorce decree or property settlement agreement. Furthermore, this Court notes that properties devised under the will fail to correspond to those listed in the property settlement agreement.

501 So.2d at 424. As in *Rasco*, in the case before us today there is absent proof of intent on John's part to revoke his pre-divorce will, and there are no references to John's will or Joy's will in the divorce decree or the property agreement. Likewise, as in *Rasco*, the properties devised or bequeathed under the wills of John and Joy "fail to correspond to those in the property settlement agreement." John's heirs-at-law were

required to show, by clear and unequivocal evidence, that John intended to revoke his 1993 will. The chancery court found, after consideration of the terms of the will, the property settlement, and the conduct of the parties, that the heirs-at-law had failed in this burden.

¶28. The heirs-at-law argue that we should afford a non-deferential de novo review of the trial court's findings based on its incorrect conclusions of law. However, both the chancellor and the Court of Appeals correctly applied our prior case law to this case, and the Court of Appeals applied the correct standard of review as to the chancellor's findings of fact. The chancellor was there on the scene, heard the testimony of the witnesses, albeit conflicting testimony, and most importantly, had the opportunity to observe the demeanor of the witnesses as they testified. As the Court of Appeals pointed out:

> However, in those instances where there is a conflict in the evidence, it is the chancellor's duty, sitting as finder of fact, to assess the evidence and determine what weight and worth to give it. *Cain v. Cain*, 795 So.2d 614, 617 (¶ 7) (Miss. Ct. App. 2001). So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, this court may not intercede simply to substitute our collective opinion for that of the chancellor. *Bower v. Bower*, 758 So.2d 405, 412 (¶ 33) (Miss. 2000).

*Hinders*, No. 2000-CA-01779-COA, at ¶ 9.

¶29. After review of the record this Court finds that the chancery court's judgment is supported by substantial evidence. In so finding, this Court acknowledges that this litigation has been traumatic for Joy and for John's heirs-at-law. Additionally, no fault should be assumed based on the preparation of the documents relevant to the divorce proceeding of John and Joy, such as the preparation of the property agreement, which appears to have contained terms and provisions common with numerous other property settlement agreements prepared in conjunction with "irreconcilable differences" divorce proceedings. But no doubt, "experience is the best teacher." Therefore, keeping in mind the requirement that pursuant to statute and case law, "any document presented as a subsequent declaration must reveal by `clear and unequivocal' evidence, an intention to revoke the will," [11] this Court strongly suggests that, in the future, if parties to a divorce action involving property settlement agreements wish to revoke prior wills, they should include express language to this effect in the property settlement agreement. After all, in today's society, it simply does not seem uncommon that divorced couples continue to maintain civil and even amicable relationships with each other.[12] That a divorced spouse who remains unmarried, though maintaining a long-term romantic relationship with another person, would choose to keep his/her ex-spouse as a legatee (even the sole legatee) under a pre-divorce will simply is not beyond the realm of comprehension. In the case before us today, we do not conclude that John chose to keep Joy as a legatee under his pre-divorce will, but we are compelled to conclude that the heirs-at-law have clearly failed to prove by "clear and unequivocal evidence" John's intention to revoke his pre-divorce will in favor of Joy. If a person wishes to remove an ex-spouse from a pre-divorce will, clearly the better course of action is to (1) make such intention clear with express language in any property settlement agreement prepared in conjunction with the divorce proceedings, and/or (2) make a new post-divorce will removing the ex-spouse from the will.[13]

## CONCLUSION

¶30. Consistent with our applicable statutes and case law, we decline to adopt a rule of revocation of a will by divorce. We also decline to adopt a rule that a pre-divorce will is automatically or expressly revoked by a divorce accompanied by a property settlement agreement with provisions inconsistent with the terms of

the pre-divorce will. On the other hand, we do once again acknowledge that there may be an implied revocation of a pre-divorce will in cases where there is a divorce accompanied by a property settlement agreement with provisions inconsistent with the terms of the pre-divorce will; however, any document submitted by a contestant as a subsequent declaration pursuant to Miss. Code Ann. § 91-5-3 must reveal by "clear and unequivocal" evidence the testator's intention to revoke the prior will by "[l]ooking to the facts and circumstances of [the particular] case, the terms of the will itself, the divorce decree and the property settlement, and the conduct of the parties." *Rasco*, 501 So.2d at 424.

¶31. Accordingly, for the reasons herein stated, the judgments of the Madison County Chancery Court and the Court of Appeals are affirmed.

¶32. **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED.**

**PITTMAN, C.J., WALLER, COBB, DIAZ AND GRAVES, JJ., CONCUR. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY, J. SMITH, P.J., NOT PARTICIPATING.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶33. The property agreement between Joy and John prior to their divorce is undeniably binding upon them. Paragraphs 16, 17, and 20 of the property agreement further bind the "heirs, estates, successors and assigns" and act as a codicil to John's will. As such, the agreement has specifically delineated how John's property should be disbursed with regards to Joy and with regards to John's heirs and his estate. The agreement should be read in conjunction with the will, and John's wishes should be followed. I disagree with the decision to essentially overlook the codicil and apply John's prior will. Accordingly, I respectfully dissent.

¶34. "A 'codicil' is a clause, or clauses, added to a will by the testator after the will has been executed, and does not revoke the will, but is to be construed with it as one entire instrument. A codicil may confirm, revoke, explain, alter, modify, add to, or subtract from any one or all the provisions of a will, and it is never considered or construed independently of the original will, but in connection therewith." *Holcomb v. Holcomb*, 173 Miss. 192, 159 So. 564, 566 (1935) (citations omitted).

¶35. Again, the agreement stated that it "shall be binding upon the Husband and Wife and also upon their heirs, estates, successors and assigns." Paragraph 16. Further, it "constitutes **the entire agreement** between the parties and each party acknowledges that there are **no other or further agreements** not expressly included herein. . ." Paragraph 17 (emphasis added). Finally, the "[a]greement shall estop and preclude either party from making **other or further demands and claims upon the other** not included herein. . ." Paragraph 20, (emphasis added).

¶36. The property agreement did not revoke the will. However, the language shows that the agreement was essentially a codicil which modified the disbursement of John's property as set forth in his will. It was a resolution of all property settlements between Joy and John, then and forever. The failure of the chancery court, the court of appeals, and the majority to read the two documents together is disastrous. Yes, John should have executed another will or included an express statement that the property agreement modified the prior will which left all of his assets to Joy. However, any reasonable person reading the will and the property agreement together and taking John's actions into account can see that John's intent was to **modify**

the disposition of his property and proceed with the property agreement as to Joy. In keeping with ***Rasco v. Estate of Rasco***, 501 So.2d 421 (Miss. 1987), John's will was not revoked, but it was, in essence, modified.

¶37. Accordingly, I dissent.

**EASLEY, J., JOINS THIS OPINION.**

1. Where necessary, there will be discussion as to whether there may have been a failure to fulfill certain provisions of the property agreement, but in our decision today, we treat this issue from the view that there was total fulfillment of the terms of the property agreement.

2. The importance of this fact will soon become apparent.

3. While of no moment in disposing of the issues before this Court, John's heirs-at-law have emphasized all along that Joy filed to have the will probated the day after John's death and before he was even buried. However, any perceived greedy motive on Joy's part is in dispute, because, inter alia, Richard Sparkman, John's certified public accountant (whose firm handled more than 165 McDonald's owners/operators nationwide), testified that he was notified by Dianne Gunn, John's in-house accountant, within an hour of John's death, and he informed Gunn to locate the will as quickly as possible because "I thought it was real important to get our hands around the operations of the business as soon as possible. I think McDonald's was also notified very shortly thereafter." (John had McDonald's franchises in Brandon, Pearl and Flowood).

4. According to the property agreement, J.J.H., Inc. also served as franchise operator for John's third McDonald's franchise in Pearl. At the time of the hearing before the chancellor, all three McDonald's franchises had been sold. Consistent with the provisions of the property agreement, Joy received nothing from the sale of the Pearl McDonald's, but she did receive $75,000 for the sale of the Brandon McDonald's and $75,000 for the sale of the Flowood McDonald's.

5. The movants were Thelma M. Hinders (Thelma), John's mother, and two of John's sisters, Joyce H. Stamps (Joyce) and Joan H. Reinhard (Joan). After Joy claimed through subsequent pleadings that John had other siblings who had not joined in the pleadings, these other siblings, James C. Hinders (James), Jennifer H. Peterson (Jennifer), Jane Hinders (Jane), and Judith Ann H. Reynolds (Judy), each executed and caused to be filed a waiver of process and general entry of appearance. The mother and siblings will sometimes be referred to collectively as John's "heirs-at-law."

6. Citing ***Hilton v. Johnson***, 194 Miss. 671, 12 So.2d 524 (1943); ***Lee v. Blewett***, 116 Miss. 341, 77 So. 147 (1918); ***Hoy v. Hoy***, 93 Miss. 732, 48 So. 903 (1909); and, ***Garrett v. Dabney***, 27 Miss. 335 (1854).

7. Citing ***Ramsey v. Robinson***, 346 So.2d 379 (Miss. 1977); and, ***Livelar v. Arnold***, 233 So.2d 760 (Miss. 1970).

8. Citing ***McKnight v. McKnight***, 267 So.2d 315 (Miss. 1972).

9. The existence of this fact is in dispute.

10. Joy in fact did make a new will after her divorce from John, and in her new will, John was not mentioned, and Joy left her entire estate to her two sisters.

11. *Rasco*, 501 So.2d at 424, citing **Matter of Will of Palmer** and **McCormack v. Warren**, both cited, *supra.*

12. Case in point - Kay and Richard Rasco continued to live together, even sleeping in the same bed, from the time of their divorce until Richard's death. *Rasco*, 501 So.2d at 422.

13. This is exactly what Joy did.